EMPLOYERS MUT. LIABILITY INS. CO. OF WISCONSIN v. HENDRIX.

No. 6407.

United States Court of Appeals Fourth Circuit.

Argued June 25, 1952.

Decided Sept. 25, 1952.

Thomas B. Whaley, Columbia, S. C. (Wise, Whaley & McCutchen, Columbia, S. C., on brief), for appellant.

Joseph L. Nettles, Columbia, S. C. (Pinckney L. Cain, Columbia, S. C., Edgar A. Brown, Barnwell, S. C., and Thomas, Cain & Nettles, Columbia, S. C., on brief), for appellee.

Before SOPER and DOBIE, Circuit Judges, and PAUL, District Judge.

SOPER, Circuit Judge.

B. L. Hendrix, the insured in a general liability policy issued by Employers Mutual Liability Insurance Company of Wisconsin, brought this suit on the policy to recover the sum of $20,000 paid by him in compromise of certain claims for damages brought against him in the Court of Common Pleas of Hampton County, South Carolina, and to recover also the additional sum of $9500 for counsel fees incurred in the litigation. The principal defenses of the Insurance Company are: (1) that none of the claims against Hendrix in the state court were within the scope of the policy; (2) that certain of the claims in suit in the state court are conceded to be beyond the scope of the policy but the money paid in settlement covered all of the claims without apportionment; (3) that the amounts paid by Hendrix was unjustifiably large and extravagant.

The insuring agreements of the policy include Coverage A, entitled "Bodily Injury Liability", wherein the Insurance Company agrees "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages, because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident."

The insuring agreements in the policy also include a section entitled "Defense, Settlement, Supplementary Payments" wherein the Company agrees to "(a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;".

The provisions of the policy in respect to assault and battery are especially important in this case since the compromised claims included actions for this tort. The defini-

tions in the body of the policy contain the following provision: "Assault and Battery. Assault and battery shall be deemed an accident unless committed by or at the direction of the insured."

By endorsement attached to the policy it is agreed that the insurance afforded by the policy for bodily injury liability applies, subject to the following provisions:

"1. In Insuring Agreement 1, the words 'caused by accident' are deleted.

"2. The term 'occurrence' is substituted for 'accident' wherever else it appears in the policy or any endorsement attached thereto.

"3. 'Occurrence' means either an accident or a continuous or repeated exposure to conditions which results in injury during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

"4. Injury intentionally inflicted shall be deemed an accident unless committed by or at the direction of the insured."

■ It is plain from these excerpts from the contract that the insurance does not cover the legal liability of Hendrix for damages because of bodily injury intentionally inflicted or committed at his direction; but that if bodily injury should be intentionally inflicted by his agent, acting in the course of his employment, upon his own initiative and not at the direction of Hendrix, any legal liability of Hendrix arising therefrom would be covered by the policy.

The company contends that according to the allegations of the complaints filed against Hendrix in the state court the assaults and batteries for which Hendrix was sued were committed at his direction. The litigation in the state court was begun by Hendrix. He brought suit against a number of residents of Hampton County to obtain a declaratory judgment with respect to his title to a large plantation and game preserve, known as the Palachucola Club, and to enjoin the defendants in the action from trespassing thereon. While the peti-tion for temporary injunction was pending, C. W. Jones, C. I. Jones, Jr., and Joe Stack, three of the defendants, filed identical counterclaims for $100,000 each against Hendrix based on allegations that Clarence Smith, a game warden in the employ of Hendrix on February 7, 1950, "acting in the actual scope and performance of his duties" committed two actionable wrongs against the claimants.

Paragraph 5 of each counter-complaint contains the allegation that Clarence Smith, while so acting, "did wilfully, wantonly, feloniously, maliciously and unlawfully make an assault upon the person of this defendant, grabbing the defendant with his hands and shaking him with great force and violence, pointed a pistol at him, in violation of Section 1119, Volume I, Code of Laws of South Carolina, thereby causing him to suffer great and severe mental pain and anguish and physical suffering, causing him to be embarrassed and humiliated in presence of the people present, to his great damage."

Paragraph 6 contains the separate allegation that at the same time and place the said Clarence Smith "did accuse the said defendant of violating the statutory laws of the State of South Carolina by committing a trespass upon the lands and property of the plaintiff; that the aforesaid statement was slanderous, false, and defamatory, and was intended to charge and did charge this defendant with a crime and was intended to injure and defame the character and reputation of this defendant in the eyes of those present and of the community in which he lived and that the said slanderous remarks have caused this defendant great mental anguish, has injured his reputation and standing in the community and has caused him much embarrassment and humiliation in that people now laugh at this defendant and ask 'How does it feel to be a criminal?' or questions to that effect."

Paragraph 7 contains the following allegation: "That on the occasion of the wilful, felonious, malicious and unlawful assault against this defendant, and the slanderous statements against him made by the said Clarence Smith as hereinabove

set out, the said Clarence Smith was, as an employee and agent of the plaintiff, B. L. Hendrix, acting under the specific and direct instructions of the said plaintiff."

It has been suggested that these counter complaints, taken as a whole, were not intended to charge and did not charge that Hendrix specifically directed Smith to commit the assaults and the slanders alleged, but merely meant that Smith was acting in the performance of his duties to keep off intruders when he committed the wrongful acts. We do not think that this construction is tenable in view of the contents of Paragraph 7. Paragraph 4 had already charged that at the time of the assault and battery Smith was acting as Hendrix' agent in the course of his duty, and the additional allegations in Paragraph 7 that Smith was acting under the specific and direct instructions of Hendrix would seem to have no meaning except to show that Hendrix ordered the agent to commit the malicious acts and therefore personally participated therein. This interpretation was in fact accepted by Hendrix' attorneys in the present case for when they arranged the settlement of the state cases, they refused to pay the sums agreed upon until the complainants amended their counter-claims and struck out the allegation that at the time of the wrongful acts Smith was acting under the specific and direct instructions of his employer. Paragraph 7 was undoubtedly added to the cross complaints to swell the claims for punitive damages which the claimants were obviously seeking to recover.

The counter complaints were filed in the state court on or about April 23, 1950 and the Insurance Company was promptly notified that they had been filed and that Hendrix would expect to be indemnified by the insurer in the event of adverse judgments. The company requested and received copies of the pleadings and on May 22, 1950 notified the attorneys for Hendrix that since the complaints alleged that the assault was at the specific direction of the assured, coverage was denied.

In support of this position the company relies upon the established rule that when the policy limits the insurer's obligation to defend to cases in which the allegations of the complaint describe an injury within the coverage of the contract, the obligation does not arise unless the allegations meet this test.

Judge Learned Hand in Lee v. Aetna Casualty & Surety Co., 2 Cir., 178 F.2d 750, 751–752, set out the correct interpretation of a similar defense clause in a policy of liability insurance in these words:

"* * * This language means that the insurer will defend the suit, if the injured party states a claim, which, qua claim, is for an injury 'covered' by the policy; it is the claim which determines the insurer's duty to defend; and it is irrelevant that the insurer may get information from the insured, or from any one else, which indicates, or even demonstrates, that the injury is not in fact 'covered.' The insurer has promised to relieve the insured of the burden of satisfying the tribunal where the suit is tried, that the claim as pleaded is 'groundless.'"

This rule would undoubtedly relieve the company of liability in this case so far as the duty to defend is concerned, if it were not for the fact that each counter-claim constitutes a complete cause of action on which the claimant might recover whether Paragraph 7 is included or left out of the pleading. In other words, it was obvious to the insurer upon reading the complaint that it was not essential to recovery that the claimant show that Hendrix specifically directed the agent's wrongful acts, because the claimant could recover damages from Hendrix by merely showing that the agent was acting within the scope of his general authority. It is true that in such a situation the obligation of the insurer to defend is not entirely free from doubt, but in our opinion the policy should be so construed as to require the insurer to defend where it is apparent from the pleading that there is a reasonable possibility that the insured may be able, under the allegations of the complaint, to prove that his injuries were caused by some act or omission covered by the terms of the contract. Such was the conclusion of the court in a similar situation in Lee v. Aetna

Casualty & Surety Co., supra; and we agree with the reasoning which led to the court's decision and is set out in the words following, 178 F.2d at page 752:

"Whether the insurer ought to defend such an action at least until it appears that the claim is not covered by the policy is not free from doubt; but it seems to us that we should resolve the doubt in favor of the insured. In most cases—the case at bar was one—it will not be difficult for the insurer to compel the injured party to disclose whether the injury is within the policy; and, if it transpires that it is not, the insurer need go on no longer. There may be cases, however, in which that question will remain uncertain even until the end of the trial, and, if the defendant is right, the insured will be obliged to conduct the defence of a claim which it turns out the insurer has promised to pay. We do not believe that, had the question been presented to the parties in advance, they would have agreed that the promise to defend did not include all occasions in which the insurer eventually becomes liable to pay."

See also in this connection Boutwell v. Employers' Liability Assurance Corp., 5 Cir., 175 F.2d 597, 601; London Guarantee & Accident Co. v. Shafer, D.C. Ohio, 35 F. Supp. 647; Globe Navigation Co. v. Maryland Casualty Co., 39 Wash. 299, 81 P. 826; Christian v. Royal Ins. Co., 185 Minn. 180, 240 N.W. 365; Pow-Well Plumbing & Heating v. Merchants Mutual Casualty Co., 195 Misc. 251, 89 N.Y.S.2d 469.

■ Consequently the Insurance Company should have undertaken the defense of the actions when notified, since bodily injury was claimed in the allegations of Paragraph 5, that Smith grabbed the defendant with his hands and shook him with great force and violence causing him to suffer great and severe physical suffering. Failing to respond when first called upon, the Insurance Company was given a second opportunity to take charge of the defense of the actions when it was notified by Hendrix' attorneys on August 7, 1950 that Hendrix had received a firm offer from the counterclaimants to accept the sum of $20,000 in full settlement of all claims, rights and damages asserted in the respective counterclaims; and that Hendrix would accept this offer, pay the money and hold the company responsible therefor and for any other loss that he might suffer by reason of the company's failure to abide by its contract, unless the company would assume the defense of the actions and indemnify Hendrix for any judgment that might be recovered against him within the limits of the policy. In response to this communication the Insurance Company reasserted its position that the actions were not covered by the policy; and thereupon Hendrix paid the sum of $10,000 to one of the claimants and $5,000 to each of the two other claimants in settlement of the claims; and in addition Hendrix paid his attorneys $7,000 on account of bills for $9,500 rendered by them for legal services in connection with the cross complaints. Contemporaneously with the settlement, and as part thereof, the original bill of complaint was dismissed.

Upon the trial of the instant suit in the District Court judgment was rendered for the plaintiff in the sum of $20,000, paid by Hendrix in settlement of the suits, plus the sum of $7,500 which the judge found to be the fair value of the legal services rendered by the attorneys. The judge further found that a settlement of the case was justified since the evidence showed that "a great deal of prejudice and some bitterness" towards Hendrix prevailed in the neighborhood caused by the fact that he was endeavoring to exclude from his plantation natives of the community who had been long accustomed to hunting and fishing on the property without regard to ownership. For the same reason the judge found that the amount paid in settlement was reasonable; but he reduced the amount of the fee of $9,500, which the attorneys charged their client, to $7,500.

■ When the insured in a liability policy settles a claim in litigation against him without trial, the questions which are open for consideration in a suit by the insured on the policy include those which relate to coverage, liability and the extent thereof. Pow-Well Plumbing & Heating v. Mer-

chants Mutual Casualty Co., 195 Misc. 251, 89 N.Y.S.2d 469; Traders & General Ins. Co. v. Rudco Oil & Gas Co., 10 Cir., 129 F.2d 621, 626, 142 A.L.R. 799; St. Louis Dressed Beef & Provision Co. v. Maryland Casualty Co., 201 U.S. 173, 26 S.Ct. 400, 50 L.Ed. 712; Elliott v. Casualty Ass'n of America, 254 Mich. 282, 236 N.W. 782; Butler Bros. v. American Fidelity Co., 120 Minn. 157, 139 N.W. 355, 44 L.R.A.,N.S., 609.

Since, as we have seen, the Insurance Company in this case failed to perform its contract to defend, the questions which remain for decision are the reasonableness of the fee charged by Hendrix' attorneys for their services and the propriety and reasonableness of the settlement of the counterclaims. The circumstances under which the settlement was made and the character and extent of the services of the lawyers were described in their testimony from which the following recital is taken: The lawyers conferred with Hendrix and brought the suit for declaratory judgment and injunction against seventeen defendants, who included the three cross claimants; and they pressed for a hearing of the petition for a temporary injunction and after a number of postponements appeared and presented the case, asking that it be sent to a special referee and that a temporary injunction be granted. After some delay the state judge denied both requests; and when the counterclaims were settled, Hendrix' case was also dismissed. For these services the attorneys charged and were paid a fee of $1,000 which is not in issue here.

When the attorneys appeared at the hearing in the state court, they were deeply impressed with the hostility towards Hendrix which was manifested by persons in the court room and on the streets of the county seat. Little else in the way of investigation was needed in their opinion to show that Hendrix stood little chance of a favorable verdict or even a fair trial upon the counterclaims if they should be submitted to a jury from the local community. Accordingly, an attorney skilled in legal research was employed to determine whether the counterclaimants would be entitled to a jury trial and he reported in the affirmative. For this investigation he was paid $500. Upon the receipt of his opinion the attorneys were convinced that a settlement was desirable and they were confirmed in their view by some additional investigation in Hampton County that the hostility observed at the injunction hearing was deep seated.

So far as the record in the case before us discloses, the settlement was based upon the hostility thus manifested by the local community towards Hendrix and upon the belief that a fair and impartial trial could not be had in the Circuit Court of Hampton County. It does not appear that the game warden was examined to ascertain what his testimony might be although the counterclaimants were questioned, with the permission of their attorney, by representatives of Hendrix; and no effort seems to have been made on Hendrix' behalf to secure other witnesses or to ascertain whether the counterclaimants had been trespassing upon Hendrix' property. One of the two leading attorneys for Hendrix testified that there was no investigation of the facts on which the counterclaims rested except by way of rumor and street talk, and that the investigation was primarily concerned to ascertain the prejudice and feeling in the community which might manifest itself in a verdict.

Moreover, no consideration seems to have been given to the South Carolina statute, Chapter 2, Article I, § 35 of the Code of Civil Procedure of South Carolina of 1942, which empowers circuit courts of the state in their discretion to change the venue in all cases, civil and criminal, pending before them, by ordering the record to be removed to another county in the same circuit, when it is shown that a fair and impartial trial cannot be had in the county where the action is commenced.

These circumstances of course do not relieve the Insurance Company from its obligation to defend or to pay the legal expenses involved, but they do bear upon the value of the legal services rendered. In our opinion, the sum of $3500 would provide ample compensation for the lawyers employed by the insured.

These circumstances are also pertinent to the inquiry into the questions of coverage and extent of liability which the court must make when the reasonableness of an amount paid by a policy holder in settlement of a claim before judgment is challenged by the insurer. It is manifest that the sum of $20,000 paid in settlement of the counterclaims cannot be charged in its entirety against the Insurance Company because the payment covered two causes of action, assault and battery and slander, without apportionment between them, and only the first cause of action was covered by the policy while the claim for slander, not involving bodily injury, was not within the terms of the contract. No attempt was made in reaching the settlement or in the trial below to show that serious injuries were caused by the assaults, which were described as grabbing hold of and shaking each of the three claimants, or to show that the consequences of these wrongful acts were more injurious than those which flowed from the slanderous statements that the claimants were guilty of criminal conduct in trespassing upon Hendrix' land. Clearly there can be no judgment against the Insurance Company until it is determined what part of the sum of $20,000 was paid in the settlement of the suits for slander.

■■ The District Judge held that the Insurance Company was liable for the entire sum paid in settlement on the ground that when an injured person brings a suit against an insured which comprises various causes of action, some within and some without the terms of the policy, the Insurance Company must defend the suit, and if it fails to do so, it becomes liable to the insured for any reasonable sum which he may have paid in compromise of all of the causes of action. We do not agree with this statement of the law, so far as liability for damages recovered by the injured person is concerned. It is true, as we have shown, that an insurer is not excused from defending suits against the policy holder by the joinder in the same suits of causes of action covered by the policy with the other causes of action beyond its scope; but the insurer is not liable for damages recovered upon or paid in compromise of the latter causes of action. The authorities cited by the appellee, namely, Lee v. Aetna Casualty & Surety Co., 2 Cir., 178 F.2d 750; Gulf Portland Cement Co. v. Globe Indemnity Co., 5 Cir., 149 F.2d 196, and Boutwell v. Employers' Liability Assurance Co., 5 Cir., 175 F.2d 597, contain nothing contrary to this view.

For another reason that goes to the heart of the case, the judgment of the District Court must be reversed. The compromise settlement was approved upon the assumption that Hendrix could not get a fair trial in the courts of South Carolina without examination of the underlying facts. The evidence offered by the insured consists of the allegations of the counterclaimants with reference to assault and battery and slander, the general report of the investigators that the claimants would testify in support of these allegations, and the testimony as to the local prejudice and hostility against Hendrix. No witness with personal knowledge of the facts underlying the charges was called to testify and the game warden, who was the alleged wrongdoer, was neither examined as a witness nor questioned to ascertain whether the charges against him were true. We do not think that upon this record the judgment can be sustained on the theory that, whatever may have been the truth of the charges or how small the actual damages sustained, the jury was likely to find a large verdict against Hendrix which would stand the test of the state courts and result in a final judgment against him. We cannot assume that the state trial judge would have permitted the trial to proceed under circumstances prejudicial to the defendant, or would have permitted an unjust or unconscionable verdict to stand, if one should be rendered. In short, there is nothing in the record before us to indicate that the payment of $20,000 was a reasonable settlement.

■ We do not mean to hold that in every suit against an insurance company to collect an amount paid by the insured in compromise of a claim covered by the policy, it is the duty of the trial court to try the original action on its merits and

make a determination of the amount of the damages suffered by the injured party. It is familiar practice for defendants of financial responsibility to take into account the inclination of juries to award compensation to injured parties; and we think that this circumstance, as well as the existence of prejudice against the insured, may properly be considered in passing upon the reasonableness of a settlement in compromise of litigation; but we hold that in every case of settlement before judgment the reasonableness of the compromise is a proper subject of inquiry which cannot be answered without some examination into the merits of the claim. Since that was not done in the pending case, and the case was tried upon an erroneous theory of law, the judgment must be reversed and the case remanded for a new trial in accordance with this opinion.

Reversed and remanded.