TRAXLER, Circuit Judge,
concurring in part and dissenting in part:
I agree with Parts I, II, III, and V of the majority opinion, but respectfully have a difference of opinion as to the amount Wausau owes as discussed in Part IV. Unlike the majority, I believe Hitt v. Cox, 737 F.2d 421 (4th Cir.1984), is inapplicable to this case, and therefore, I dissent.
I.
After experiencing substantial defects in the construction of the “Yacht Cove” condominium project, the Yacht Cove Owners Association (“Owners Association”) sued the general contractors, National Stonehenge Corporation and Stonehenge Engineering Corporation (collectively “Stonehenge”), in state court and asserted actual damages in excess of $1.3 million as well as a right to punitive damages. The damage to the condominiums began on April 1, 1985 and continued until March 17, 1997. Stonehenge contended (and later proved) that insurance existed for a substantial portion of the damage period. The breakdown of coverage was as follows:
7/1/86' — 11/1/87 Maryland Casualty Insurance Company
11/1/87- — -11/1/91 Aetna Casualty and Surety Company
11/1/91 — 11/1/92 Home Insurance Company
11/1/92 — 11/1/95 Employers Insurance of Wausau
These insurance companies were notified of the lawsuit, and all except Wausau participated in the defense of Stonehenge. Despite repeated requests, Wausau refused to defend Stonehenge or to be involved in settlement negotiations.
On the day of trial, Stonehenge and the Owners Association reached a settlement in which all of the insurance companies, except Wausau, participated. The general terms were placed on the record in open court and in relevant part were as follows: Stonehenge Engineering Corporation and National Stonehenge Corporation agreed to confess judgment to the Owners Association in the amount of $750,000. With regard to the payments, the attorney presenting the settlement told the court:
We also believe that the position of one carrier[,] Employer’s Mutual of Wau-sau[,] and their denial of coverage to the defendants has placed Stonehenge in a precarious position. Three of Stonehenge’s liability insurance carriers have agreed to pay the plaintiff the sum of $475,000 as follows: The Aetna Casualty Insurance Company will pay $300,000; the Maryland Insurance Company will pay $100,000; and the Home Insurance Company will pay $75,000.
When the $475,000 payment is made to the plaintiff, that will be credited against the Confession of Judgment leaving a balance on the Confession of Judgment of $275,000. Stonehenge will give the three insurance carriers who are contributing to the resolution of the case a release from the Yacht Cove claim upon *309 receiving these payments, and the payments have been agreed to be made to the plaintiff within 30 days from today: March 17th.
J.A. 24. At the conclusion of the presentation, the state trial judge made a specific finding, based upon his review of the file and the documentation supplied by the parties, that the settlement was “a fair and equitable resolution of the matter.” J.A. 29.
The formal settlement documents were later signed memorializing the oral presentation made in open court. In addition to the terms related above, the Owners Association signed a covenant not to file or execute on the Confession of Judgment against National Stonehenge Corporation unless, in subsequent litigation, “Wausau successfully prove[d] and a[e]ourt of competent jurisdiction determine^] that either [Stonehenge Engineering] or [National Stonehenge] were not named insureds or additional named insureds under the [three] policies of insurance [issued from 11/1/92 to 11/1/95] or and [sic] no recovery is made against Wausau.” J.A. 342 (emphasis in original).
The Owners Association gave no such covenant to Stonehenge Engineering, but did agree not to execute on the judgment against Stonehenge Engineering until'all efforts to secure payment from Wausau had been completed and then only to the extent the judgment was left unpaid after the action against Wausau. In order to protect Stonehenge Engineering, the Owners Association agreed not to settle with Wausau for an amount less than what Stonehenge Engineering would owe under the Confession of Judgment, without prior approval from Stonehenge Engineering.
II.
Stonehenge subsequently brought this lawsuit against Wausau seeking, among other claims, payment by Wausau of the balance of the judgment owed by Stonehenge to the Owners Association — $275,-000. Ultimately, on cross-motions for summary judgment as to Stonehenge’s breach of contract claim, the district court granted Stonehenge partial summary judgment against Wausau, finding that coverage did exist. The parties then stipulated that it was appropriate for the district court to allocate the amount of damages owed by Wausau. In so doing, the district court made a specific finding that the $750,000 settlement “was not entered into collusively and fraudulently and [was] a proper amount upon which to calculate the allocation.” J.A. 185.
We review the grant of summary judgment to Stonehenge de novo, viewing the evidence in the light most favorable to Wausau. See Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir.1988). With regard to the allocation of damages by the district court,we review the district court’s legal determinations de novo, see Neathery v. M/V Overseas Marilyn, 700 F.2d 140, 143 n. 2 (4th Cir.1983), and its factual findings for clear error, see Bonds v. Mortensen & Lange, 717 F.2d 123, 125 (4th Cir.1983).
III.
A.
Because of the impracticality of determining the actual amount of damage that occurred during each insurance period, the parties proposed various methods of allocation. As might be expected, Wausau submitted a proposal to the district judge in which it would pay as little as $33,125, while Stonehenge submitted a theory to justify as much as $259,575. Only two cases were cited to the district judge — Joe Harden Builders, Inc. v. Aetna Casualty & Surety Co., 326 S.C. 231, 486 S.E.2d 89 (1997), and Sentinel Insurance Co. v. First Insurance Co. of Hawaii, 76 Hawai’i 277, 875 P.2d 894 (1994). With this information, the district judge turned to the task the parties had given him.
He first had to determine an appropriate baseline for the allocation of damages. *310 Wausau itself proposed only three choices: $750,000 — the amount of the Confession of Judgment; $625,000 — Stonehenge’s lowest offer to settle in 1997; and $475,000 — the amount the other three insurance companies had paid which Wausau viewed as the settlement total. After reviewing the information, the district judge found that the $750,000 was a proper amount upon which to calculate allocation. Because there are ample reasons to justify the district court’s finding, I would accept it.
First, the judge noted that the agreed cap of $750,000 was in settlement of an alleged claim of over $1.3 million in actual damages. Second, the district court found as fact that the settlement amount was not the result of any collusion or fraud, and as he reminded in his order, the state trial judge had also found the settlement figure to be fair and equitable. Third, the $750,-000 figure approximated amounts which had been discussed in prior settlement negotiations between the Owners Association and Stonehenge. And lastly, the district judge pointed out that the use of the settlement amount would result in Wausau making a coverage payment roughly in proportion to the payments previously made by the other carriers based upon the number of years each had insured Stonehenge. Because each one of these reasons is sound, I would uphold the district court’s finding of $750,000 as the proper basis for damages and the appropriate starting point in the allocation process.
B.
Rejecting the district court’s rationale for allocating damages based upon the settlement amount of 750,000, the majority instead takes the position that the basis for allocation of damages is $475,000, which represents the total already paid by the other three insurance companies. I disagree for several reasons.
First, rejection by the majority of the Confession of Judgment amount is based on Hitt v. Cox, 737 F.2d 421 (4th Cir.1984). This case, however, was never cited to the district court during the allocation process. Its use here concerns me for a number of reasons, not the least of which is the fact that I do not believe it is dispositive of our case.
In Hitt, the insured defendant settled the underlying lawsuit for $500,000, but only agreed to personally pay the injured plaintiff $350,000. The remaining $150,000 would only be paid if the insured successfully obtained indemnification from its insurance company for an amount up to the policy limits of $500,000. In other words, the insured’s legal obligation to pay the additional $150,000 was directly contingent on its success in the indemnification action against the insurance company. We condemned such an arrangement and denied indemnification to the insured because, after settlement, the insured would never be obligated to contribute another dollar from its own pocket. Thus, the underlying premise of Hitt was that the insured had fully extinguished its personal exposure through the settlement for $350,000 and, therefore, had nothing to lose by guaranteeing the injured party more money so long as the additional money would only be paid if the indemnification suit against the insurance company produced it.
The obvious difference in the case before us is that National Stonehenge and Stonehenge Engineering from the outset of the settlement had personal liability for the entire settlement amount. The Confession of Judgment was a valid judgment against both National Stonehenge and Stonehenge Engineering. National Stonehenge would be obligated to pay the judgment personally if the contingencies described in the settlement agreement came to pass.
For Stonehenge Engineering, the Confession of Judgment stands as a very real liability as well. Stonehenge Engineering is not immune from execution of the judgment if the action against Wausau fails or falls short of providing funds with which to satisfy the Confession of Judgment. Lia *311 bility for the amount not paid by the three insurance companies, $275,000, continues against Stonehenge Engineering.
Wausau nevertheless strains to invoke Hitt on the theory that neither National Stonehenge nor Stonehenge Engineering ever expected, as a practical matter, to pay the judgment. In so doing, Wausau necessarily first tries to focus our attention on events which developed after the settlement. Specifically, Wausau wants us to view National Stonehenge as having had no exposure at the time of settlement because now it has been established that both National Stonehenge and Stonehenge Engineering were insureds under the Wausau policies and the district judge has determined there will be recovery against Wausau. In light of these findings, National Stonehenge is now cleared of any liability.
In Hitt, unlike the case before us, the insured’s responsibility to pay did not exist upon settlement, but arose only after indemnification litigation was pursued against the insurance company and then only if pursued to a successful conclusion. However, in circumstances like these, the financial exposure of a party to a settlement must be determined as of the date of settlement and not in the light of how legitimate uncertainties later resolve themselves. When National Stonehenge settled the case with the Owners Association, National Stonehenge was liable for the balance due with only filing of the judgment and execution thereon withheld pending resolution of the contingencies in a subsequent and separate court proceeding. The fact that National Stonehenge was ultimately relieved of responsibility does not change the fact that when it settled the case, National Stonehenge had committed itself to liability. Consequently, I find no basis in Hitt to disregard the settlement amount agreed to by National Stonehenge.
Wausau also seeks to invalidate Stonehenge Engineering’s liability for the settlement by alleging that Stonehenge Engineering was insolvent and hence had nothing to lose by settling the case for any amount. In making this argument, Wausau seeks to equate the insured in Hitt with Stonehenge Engineering by claiming that neither had any incentive to limit the amount of the settlement. From this Wausau argues that the agreement to pay more than $475,000 was a sham and that Hitt dictates that the excess be disregarded. In my opinion, this extends Hitt far beyond its intended effect.
Hitt does not deal with the insolvency of a party to a settlement. Rather, Hitt’s reference to payment from an insured’s personal resources was, in my view, merely to contrast that payment from payment which would be legally due only after successful indemnification actions against insurance companies. Nowhere in Hitt is there a reason to condition payment by an insurance company of a settlement amount on the personal resources of an insured. Yet Wausau wants to read Hitt as authority for it to ignore the validity of a settlement amount solely because its insured may have been unable to pay at the time. I cannot agree. Accepting this argument, in my opinion, is tantamount to changing the terms of the very insurance contract at issue. Wausau agreed to pay on behalf of Stonehenge Engineering (and National Stonehenge) “those sums that the insured becomes legally obligated to pay as damages because of ... ‘property damage’ to which this insurance applies.” J.A. 365. Nowhere in the contract is the solvency of the insured a condition of payment, nor is there any such limitation on indemnification for a settlement. And, as has been shown previously, the insureds had a legal obligation to pay the Confession of Judgment.
Of course, an insurance company is not without protection. It has long been established that “[wjhen the insured in a liability policy settles a claim in litigation against him without trial, the questions which are open for consideration in a suit by the insured to the policy include those which relate to coverage, liability and the *312 extent thereof.” Employers Mut. Liab. Ins. Co. of Wisconsin v. Hendrix, 199 F.2d 53, 57 (4th Cir.1952). Thus, the reasonableness of a settlement “is a proper subject of inquiry.” Id. at 60; see also Hitt, 737 F.2d at 425. But in the case before us, the state trial court specifically concluded that the settlement was fair and reasonable and, in partial reliance thereon, the district court found that there was no evidence of fraud or collusion. Hence, I see no reason, and certainly no basis in the insurance contract, to disregard the settlement amount and leave the insured at risk on the presumption that the insured will never want to pay, or be able to pay, the judgment against it.
C.
• Even if Hitt is somehow applicable, and Stonehenge Engineering’s fiscal status is relevant, we still should not enter judgment at this time. There have never been any findings of fact as to the financial status of Stonehenge Engineering — it has never been litigated. If Wausau’s responsibility to pay is dependent on whether Stonehenge Engineering was solvent at the time it entered into the settlement, Stonehenge Engineering is entitled to prove that it was. solvent. Wausau asks us to excuse litigation of this question before the district court and, instead, to decide this factual dispute ourselves from the fragments of evidence which happen to appear in the Joint Appendix. I cannot sanction resolution of this issue in Wau-sau’s favor when Stonehenge Engineering has never had a chance, much less a need, to present evidence of its solvency.
IV.
As stated previously, I agree with the district judge that the correct damage basis is $750,000. After deciding this, the district judge proceeded to compute the proportion of damage Wausau should bear. Specifically, after determining the period during which the damage occurred, the judge found that Wausau’s insurance coverage between November 1, 1992 and November 1, 1995 accounted for 25.4 percent of the total damage period. Then, utilizing the total damage figure of $750,000, the judge determined that Wausau owed $190,-500 from its $1 million coverage.
The majority agrees that Wausau had coverage for 25.4 percent of the damage period, but limits the judgment to Stonehenge to $120,650 — -a figure calculated upon what the three other insurance companies collectively agreed to pay, in varied amounts depending upon their respective coverage periods. I confess to being unable to understand how the majority reaches this result.
As an initial premise, I am not so willing as the majority to presume that Maryland Casualty, Aetna, and Home Insurance, which collectively had coverage for only a little over half of the total damage period, agreed to pay the total amount of actual damages. Furthermore, if Hitt controls, as the majority believes, and any amount agreed to be paid over and above the amount the other insurance companies agreed to pay is “patently unreasonable” and “invalid,” Hitt, 737 F.2d at 426, then it seems that no additional money should be paid to Stonehenge, leaving Wausau with no obligation at all. Further, if Wausau’s responsibility is to be a percentage of the $475,000 already paid in full by the other insurance companies, requiring Wausau to pay $120,650 will actually result in Stonehenge recovering an amount over and above the $475,000.
These anomalies, in my judgment, show that the resolution the trial judge reached was fair and eminently reasonable. The chart below reflects his decision. A comparison of the amounts actually paid by the other insurance companies to the allocations the district judge used in his independent determination reflects the fairness of his decision.
*313 EQUITABLE ALLOCATION OF DAMAGES OCCURRING FROM 11/1/85 TO 3/17/97
Carrier Percentage of Time Proportion Number of There Was of Damages Dates of Years of Coverage Due Per Coverage Coverage Court District Actually Paid
Initial Carrier 4/1/85 to 1.25 or Stonehenge[1] 7/1/86 .106 79,500
Maryland Casualty 7/1/86 to 1.3 11/1/87 .113 84.750 100,000
Aetna 11/1/87 to 4 11/1/91 .339 254,250 300,000
Home Insurance 11/1/91 to 1 11/1/92 .085 63.750 75,000
Wausau 11/1/92 to 3 11/1/95 .254 190,500 [120,650][2]
Final Carrier 11/1/95 to 1.21 or Stonehenge 3/17/97 .103 90.750
Although the other insurance companies paid more in settlement than would have been called for under the district judge’s calculations, the differences are, in my opinion, minimal. If anything, Wausau would obviously benefit financially from the fact that the assessment of its responsibility was made with the cool reflection of a district judge rather than in the heat of a state court battle with the prospect of a large actual and punitive damage verdict staring it in the face.
V.
In conclusion, I would accept the sum of $750,000 as a proper basis for the allocation of Wausau’s share of the damages, and I would affirm the district court’s method of computing the specific sum due from Wausau. Therefore, I respectfully dissent from Part IV of the majority’s opinion.

. According to the district court:
The record does not identify the initial and final insurance carriers during the trigger period. The identity of these carriers, or whether any coverage even existed during those periods, is immaterial for the purpose of establishing Wausau’s equitable share. The Court’s calculation is based on proportioning damages throughout the duration of the entire trigger period. If the plaintiffs did not have coverage in the first and last periods, then they would be responsible for the damages that are apportioned to those periods. J.A. 192.

. This amount reflects Wausau’s share per the majority opinion.