AMERICAN MOTORISTS INSURANCE
COMPANY, an Illinois
corporation, Plaintiff,

v.

The TRANE COMPANY, a Wisconsin cor-
poration, Employers Mutual Liability In-
surance Co. of Wisconsin, a Wisconsin
corporation, St. Paul Fire and Marine
Insurance Company, a Minnesota corpo-
ration, and American Home Assurance
Company, a New York corporation, De-
fendants.

No. 74–C–421.

United States District Court,
W. D. Wisconsin.

Aug. 4, 1982.

John F. Jenswold, Madison, Wis., for plaintiff.

Eugene O. Gehl, Madison, Wis., for Employers Mut. Liability Ins. Co. of Wisconsin.

Conrad H. Johnson, Madison, Wis., for American Home Assur. Co.

Thomas P. Kane, St. Paul, Minn., for St. Paul Fire and Marine Ins. Co.

Stuart S. Ball, Sidley & Austin, Chicago, Ill., for The Trane Co.

CRABB, Chief Judge.

This is a civil case in which the plaintiff insurer seeks a declaratory judgment concerning the coverage offered under one of its policies. Defendant Trane counterclaims and cross-claims for monetary damages and attorneys' fees based on breaches of the plaintiff and defendant insurers' duty to defend.

Jurisdiction is predicated upon diversity of citizenship. 28 U.S.C. § 1332.[1] The parties agree that Wisconsin substantive law governs the disposition of this action.

The insurance coverage questions in this case arise out of a dispute among Trane and J. F. Pritchard and Company, J. F. Pritchard & Company, and Pritchard-Rhodes, Ltd. (hereafter collectively referred to as Pritchard) about the quality of a component part supplied by Trane in four Pritchard liquid natural gas plants. When the partial failure of the component part caused Trane to become involved in litigation with Pritchard,[2] Trane tendered the defense of the cases to each of its four insurers: American Motorists Insurance Company, Employers Mutual Liability Insurance Company of Wisconsin, St. Paul Fire and Marine Insurance Company, and American Home Assurance Company. Apparently, St. Paul was willing to undertake part of the defense. Employers and American Home refused to defend Trane on the grounds that the Trane-Pritchard incident fell outside the coverage of their policies. American Motorists commenced this action for a declaratory judgment as to its and the other insurers' rights and duties under the policies each had issued to Trane.

Trane regarded the insurers' actions as refusals of their duty to defend and, through its own attorneys, entered into settlement discussions with Pritchard. Trane ultimately settled its dispute with Pritchard and amended its answer in this action to assert a counterclaim and cross-claims against the respective insurance companies. The counterclaim and cross-claims alleged four causes of action: (1) breach of contract to indemnify Trane for sums spent in settlement of Pritchard claims; (2) breach of contract to defend Trane in its actions against Pritchard; (3) intentional interference with Trane's defense of the Pritchard claims, amounting to willful and gross breach of the fiduciary duty owed by an insurer to the insured; and (4) conspiracy to refuse to defend Trane and to interfere with Trane's own defense against Pritchard. As damages, Trane claimed reimbursement for the settlement made with Pritchard, all attorneys' fees and other expenses involved in the present action, and an exemplary award.

This case is before the court on each of the insurers' motions for summary judgment on the issue of the coverage of their policies and on Trane's motion for partial summary judgment on the issue of the insurers' alleged breach of their duty to defend. From the uncontested allegations and the evidentiary materials submitted by the parties, I find no genuine issue as to the material facts summarized under the heading, FACTS. I find also that there is no genuine issue as to the fact that the insurance policies in question contain the language referred to in the separate discussions of the four policies.

## FACTS

*Background*

Natural gas is distributed through pipelines by suppliers to local utilities who in turn distribute the gas to their residential and commercial customers. Since most nat-

---

1. On May 9, 1978, defendant American Home filed a motion in this case requesting that defendant Employers be realigned with the plaintiff. By order of November 7, 1980, I granted American Home's motion to realign and dismissed the entire action for lack of subject matter jurisdiction, finding that complete diversity of citizenship was not present. *American Motorists Insurance Co. v. The Trane Co.,* No. 78–C–421 (W.D.Wis., November 7, 1980). On appeal, the Court of Appeals for the Seventh Circuit reversed and the case was returned to this court for further proceedings. *American Motorists Insurance Co. v. The Trane Co.,* 657 F.2d 146 (7th Cir. 1981).

2. Trane sued the three Pritchard companies in the Western District of Wisconsin (Case No. 74–C–152) for failure to pay Trane amounts which Trane claimed were owed to it under the contracts for the heat exchangers. The Pritchard companies each filed an answer in that action and counterclaimed against Trane. In addition, J. F. Pritchard and Company and Pritchard-Rhodes, Ltd. filed a separate lawsuit against Trane in the United States District Court for the Southern District of Texas (Case No. 74–H–676).

ural gas is used by consumers for heating, demand for gas increases in cold weather. On the coldest or "peak" days, when demand is highest, the ability of a local utility to supply all the gas needed by its customers may be limited by the pipeline capacity of its suppliers. Moreover, even if a local utility can supply all of its customers' needs during a peak period, this service will be expensive because the cost of gas is determined in large measure by a "demand charge"—a charge for the pipeline deliverability capacity based upon the peak day usage but applied on an annual basis. Thus, the more a utility must rely on obtaining gas from its supplier during peak periods, the greater is its risk of not meeting demand and incurring increased costs.

A local utility can insure deliverability to its customers and reduce its costs by buying and storing gas during non-peak periods for use during peak periods. Utilities which choose to store gas for use during peak periods often build gas liquefaction plants to convert the natural gas from a gaseous to a liquid state. As a liquid, natural gas occupies only a small fraction of the space it occupies in its gaseous state; consequently, the liquefaction of natural gas permits larger quantities of gas to be stored by local utilities than would be possible if the utility attempted to store natural gas in its gaseous state. Because the utility is able to store more natural gas, it is less dependent on its supplier during peak periods and reaps the corresponding benefits of reduced costs and increased reliability. Liquefaction also permits the economical transportation of gas in ships from foreign countries.

Liquefaction of natural gas is accomplished through a cooling process. In the late 1960's and early 1970's, the Pritchard companies developed a design for natural gas liquefaction plants called the "PRICO process." This process was unique in that it combined three refrigerants into a single gaseous stream to cool natural gas into a liquid state. Prior to this time, a three-step process has been used, utilizing a single refrigerant in each step. As part of the development of the PRICO process, Pritchard contacted Trane to see whether Trane

could manufacture a heat exchanger for the new process. A heat exchanger is that part of the plant in which the natural gas is cooled to a liquid state by the refrigerant.

Pritchard and Trane reached an agreement regarding the production of heat exchangers and the Trane heat exchanger became a fundamental component in the natural gas liquefaction plants which Pritchard hoped to construct for the Chattanooga Gas Company (Chattanooga), Northern Indiana Public Service Company (NIPSCO), Springfield Gas Company (Springfield), and for the Algerian government (Skikda). When Pritchard was awarded the contracts for these plants, Trane constructed and sold the heat exchangers which were used in them. The exchangers built for Chattanooga, Springfield, and Skikda were sold to Pritchard, while the heat exchanger for NIPSCO was sold directly to NIPSCO.

The plants at Chattanooga, Springfield, and NIPSCO were "peak shaving plants" or plants designed to make and store liquid natural gas in periods of low use for distribution in periods of high use. The plant at Skikda was a "base load plant," which was a plant designed to make and store huge quantities of liquid natural gas for export. The Skikda plant was much larger than the other three plants.

Each of the four heat exchangers used the same general design, although some differences were required by the unique qualities of each plant. Each heat exchanger had cores through which natural gas and liquid refrigerants passed as part of the cooling process. Inside the cores were "fins" to affect the mixed refrigerant stream. In the Chattanooga, Springfield and NIPSCO plants, each of the heat exchangers contained three cores in a horizontal position with serrated fins. In the Skikda plant, the heat exchanger was to have approximately 40 cores in the horizontal position with serrated fins.

### Failure of the Heat Exchangers

The Chattanooga plant was the first plant to begin production after it was completed in the fall of 1972. Once the initial

starting procedures had been completed, it was evident to all parties that the plant could not operate at the predicted capacity set forth in the contract between Pritchard and Chattanooga. On an average, the plant was experiencing a 20–25% shortfall in production. Testing was immediately begun by Pritchard, Trane and outside consultants to determine the cause of the shortfall. As a result of this testing, modifications were made to both the plant and the heat exchangers, but the shortfall was not corrected. Ultimately, in 1975, the Trane exchangers in the Chattanooga plant were replaced with exchangers built by the Kobe Corporation. The Kobe heat exchangers contained cores in the vertical position with perforated fins. With the Kobe heat exchangers, the Chattanooga plant was able to operate above its predicted capacity.

The Springfield plant began production in the fall of 1973 and also experienced a shortfall, but to a lesser extent than Chattanooga. Prior to start-up, certain changes had been made in the plant and in the Trane heat exchangers to try to head off the expected shortfall. The shortfall at Springfield was 5% or less of predicted capacity. The Trane heat exchangers were not replaced at Springfield and the plant was accepted ultimately by the purchaser.

The NIPSCO plant began production in 1975 with a Trane heat exchanger modified by the addition of a fourth core. This plant experienced a shortfall in the range of 5–10%. Ultimately, this plant was accepted by NIPSCO with the Trane heat exchangers.

Prior to 1978, the Skikda plant had not begun production. Based on the experience at the other three plants, calculations were made which estimated that Skikda would experience a 20% shortfall.

*The policies*

Employers insured Trane under Comprehensive General Liability Policies issued annually from June 1, 1969, to August 1, 1976. (The last policy issued was in effect only from June 1 to August 1, 1976.) In the policies Employers issued to Trane from June 1, 1973, until August 1, 1976, there is language which differs slightly from that of the preceding years' policies. The pre-1973 policies under which Trane was covered were Nos. 0120–00–060762, 0121–00–060762, 0122–00–060762, and 0123–00–060762. The post-1973 policies were Nos. 0124–00–060762, 0125–00–060762, 0126–00–060762, and 0127–00–060762.

American Motorists insured Trane under Policy No. 1 CP 904 10 which was in effect throughout the period relevant to this action.

St. Paul insured Trane under Excess Third Party Liability Policy # 563XA3466, which was in effect from July 1, 1971, to July 1, 1972, and was extended by endorsement until July 1, 1974.

American Home insured Trane under a "following form" Excess Umbrella Liability Policy # CE 2714–94–52, covering the period from July 1, 1972 to June 1, 1975.

*The underlying action*

In May of 1974, Trane began an action in the United States District Court for the Western District of Wisconsin against Pritchard to recover certain sums owed by Pritchard to Trane on the Skikda contract. Pritchard answered and counterclaimed and began its own action in the United States District Court for the Southern District of Texas alleging facts similar to those in its counterclaim. In these two actions, Pritchard asserted claims as to each plant stemming from the production shortfalls based upon six theories: (1) misrepresentation, (2) breach of implied warranty of fitness, (3) breach of implied warranty of merchantability, (4) breach of express warranty, (5) negligent design or manufacture or both, and (6) breach of Trane's obligation to honor its warranties.

Pritchard claimed as damages money spent in attempted solutions of the shortfall problems before discovery that the Trane heat exchangers were the source of the problem, all sums for which it may have become liable under contracts with the various utilities because of the shortfall in production, all sums which it had to spend to rectify the failure of the heat exchangers to

perform up to specifications, and damage to its own business reputation resulting from the heat exchanger problem. Allegedly, these damages exceeded $1 million with respect to the Chattanooga plant and $25 million with respect to the Skikda plant.

## OPINION

### Outline of the Opinion Section

I. DUTY TO DEFEND—THE STANDARD FOR DECISIONMAKING

II. EMPLOYERS
  A. The Policy Definition Of The Duty To Defend
  B. Damages Claimed By Pritchard Against Trane
    1. Nature of the allegations
    2. Additional facts
  C. Potential Coverage Under The Substantive Provisions Of The Policy
    1. Chattanooga plant
      a. The Pritchard allegations constitute property damage as defined in Employers' policy
      b. The Pritchard allegations constitute an occurrence under the Employers policy
      c. Coverage under the policy was indicated by Pritchard's complaint
      d. Damages which Trane would have been obligated to pay were alleged by Pritchard
      e. Exclusion (k) does not preclude coverage of the Pritchard allegations
      f. Conflict of interest
    2. Springfield, NIPSCO, Skikda plants
  D. Remedy For Breach Of Duty To Defend
  E. Employers' Liability For The Springfield, NIPSCO, And Skikda Claims

III. AMERICAN MOTORISTS
  A. The Policy Definition Of The Duty To Defend
  B. Potential Coverage Under The Substantive Provisions Of The Policy
    1. The four basic factors warranting coverage were alleged by Pritchard
    2. Exclusion (e)
  C. Consequences Of American Motorists' Failure To Defend Trane
  D. American Motorists' Liability To Trane Under Its Duty To Indemnify

IV. ST. PAUL
  A. Duty To Defend
  B. Duty to Indemnify

V. AMERICAN HOME
  A. Duty To Defend
  B. Duty To Indemnify

All four of the insurers have moved for summary judgment on the issue of their individual coverage of Trane's claims. Trane has moved for summary judgment on the issue of the insurers' duty to defend Trane. In addition, American Motorists, St. Paul, and American Home each seek a determination of its duty in comparison with that of the other insurers. Inasmuch as the duty to defend encompasses a broader range of circumstances than the duty to indemnify where liability is present, I will consider each insurers' liability first in the context of Trane's motion for summary judgment on the issue of the duty to defend and then in reference to that insurer's motion for summary judgment on the issue of its duty to indemnify.

■ In construing insurance contracts under Wisconsin law, the objective of the court is to ascertain and carry out the intention of the parties. *Home Mutual Insurance Co. v. Insurance Co. of North America*, 20 Wis.2d 48, 121 N.W.2d 275 (1963). In addition, Wisconsin law mandates several other rules of construction:

When ambiguous, an exclusionary clause in an insurance contract should be strictly construed against the insurer. *Meiser v. Aetna Casualty and Surety Co.*, 8 Wis.2d 233, 98 N.W.2d 919 (1959). The test of coverage is not what the insurer intended to cover, but what a reasonable person in the position of the insured would have understood to be covered. *Ehlers v. Colonial Penn Insurance Company*, 81 Wis.2d 64, 259 N.W.2d 78 (1977).

The words used in an insurance contract should be given their common everyday meaning, *Schmidt v. Luchterhand*, 62 Wis.2d 125, 214 N.W.2d 393 (1974), and should be interpreted reasonably so as to avoid absurd results. *Olguin v. Allstate Insurance Company*, 71 Wis.2d 160, 237 N.W.2d 694 (1976). *Patrick v. Head of Lakes Cooperative Electric Ass'n*, 98 Wis.2d 66, 69, 295 N.W.2d 205 (Ct.App.1980).

## I. DUTY TO DEFEND—THE STANDARD FOR DECISIONMAKING

None of the insurance policies at issue which contain provisions requiring the insured to defend describes the manner in which the insured is to determine whether such a duty exists in a particular case. Since there is no indication of the intention of the parties on this point, I must turn to Wisconsin law for the appropriate standard.

The standard for determining when an insurer has a duty to defend was declared recently by the Wisconsin Supreme Court in *Sola Basic Ind. v. United States Fidelity and Guaranty Co.*, 90 Wis.2d 641, 646–47, 280 N.W.2d 211 (1979):

> To determine whether an insurer is obligated to assume the defense of a third-party suit, it is necessary to determine whether the complaint alleges facts which, if proven, would give rise to liability covered under the terms and conditions of the policy. *Grieb v. Citizens Casualty Co. of New York*, 33 Wis.2d 552, 557, 148 N.W.2d 103 (1967). Doubts about coverage must be resolved by the insurer in favor of the insured. *Capitol Indemnity Corp. v. St. Paul Fire & Marine Ins. Co.*, 357 F.Supp. 399, 412–13 (W.D.Wis.1972).

Trane relies on *Sola* for the proposition that the duty to defend should be determined by an assessment of the allegations in the Pritchard complaint alone. Trane insists that neither the insurers nor this court should refer to other facts which might tend to shed additional light on whether the claims against it were covered by the policies.

Employers argues that Wisconsin law also recognizes exceptions to the general rule expressed in *Sola* and cites *Grieb v. Citizens Casualty Co.*, 33 Wis.2d 552, 148 N.W.2d 103 (1967).[3] In *Grieb*, the court stated:

> There are at least four exceptions to the general rule determining the extent of the insurer's duty to defend and generally the insurer who declines to defend does so at his peril. These and allied problems are extensively covered in Anno. Liability Insurer—Duty to Defend, 50 A.L.R.2d 458.

33 Wis.2d at 558, 148 N.W.2d 103. Because in *Sola* the court relied on *Grieb* in developing its basic standard, Employers argues that the language in *Grieb*, recognizing exceptions to the basic standard, should also be considered a part of the *Sola* standard. Consequently, Employers asserts a right to look beyond the facts alleged in the complaint of the third party suit in determining its duty to defend. Specifically, Employers argues that where facts which are known or readily ascertainable by the insurer conflict with the pleadings, the facts and not the pleadings should be used to determine the insurer's duty. *See* 50 A.L.R.2d 500–04.

A federal court sitting in a diversity case is obligated to ascertain what state law provides on substantive issues. There is an apparent discrepancy in Wisconsin law on the issue of determining the duty to defend because the standard established in *Sola* is undercut somewhat by the court's reliance on *Grieb* in its *Sola* opinion. There can be no suggestion that *Sola* overrules *Grieb* since the facts in *Sola* did not warrant consideration of any exception to the general rule. On the other hand, the cited language in *Grieb* is clearly dictum since none of the exceptions referred to in the opinion

---

**3.** Although I refer in this section to the argument made by Employers on behalf of the insurers, I note that American Motorists has submitted arguments which coincide with and support Employers' position. Indeed, with minor exceptions noted later in this opinion, the positions of these two parties are indistinguishable from one another.

was the basis for that decision.[4] No other Wisconsin cases have addressed this precise issue.[5]

■ I conclude that the decision in *Sola* is qualified by *Grieb* and that the language of *Grieb* recognizing the existence of exceptions to the general rule for ascertaining the duty to defend is the clearest indication of Wisconsin law on this point. *Grieb* suggests that under Wisconsin law an insurer may consider known or readily ascertainable facts when deciding whether to defend an insured. However, the general rule of *Sola* still requires basing the duty to defend on the allegations of the complaint; the exception applies only where there is a conflict between the allegations and facts or where the allegations are ambiguous. 50 A.L.R.2d at 496. In Wisconsin, therefore, the court may consider facts known at the appropriate time by the insurer when determining whether the insurer has breached its duty to defend. However, the timing of this additional inquiry and the use made of the facts is circumscribed by the *Sola* rule emphasizing the broad scope of the duty to defend.

## II. EMPLOYERS

### A. The Policy Definition Of The Duty To Defend

■ Employers is Trane's primary insurer. The policies under which Trane was insured by Employers fall into two groups: pre-1973 and post-1973. Some differences in the language of the policies exist between the two groups. Each of the annual policies, however, contains Employers' agreement to

> pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence.

Each policy also states that Employers

> shall have the right and duty to defend any suit against the insured seeking dam-

ages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient.

According to these provisions, therefore, Employers had a duty to defend any suit seeking damages of the type covered by its policy, even if the allegations describing the damages were groundless, false or fraudulent.

However, Employers seems to rely on the *Grieb* exception to suggest that its duty to defend Trane should not be defined by Pritchard's allegations against Trane. Rather, Employers maintains that it should be able to rely on its own independent determination of the factual basis for the Pritchard allegations before deciding whether or not to defend. According to this theory, if Employers discovered that the allegations were false or groundless, its duty would not be defined by those false or groundless allegations, an approach which appears to contradict the express terms of the Employers policy defining the duty to defend.

■ A contract must be construed to give meaning to each of its provisions. *Stanhope v. Brown County*, 90 Wis.2d 823, 280 N.W.2d 711 (1979); *Kraemer Brothers, Inc. v. United States Fire Insurance Co.*, 89 Wis.2d 555, 278 N.W.2d 857 (1979). Employers' contract with Trane provides expressly that Employers will defend Trane in any suit involving covered property damage, even if the allegations of such damage are groundless, false or fraudulent. Although under state law, Employers might have a right to consider known or ascertainable facts where they conflict with the pleadings, its right does not extend so far as to subvert its contractual duty to defend suits based on groundless, false or fraudulent allegations.

---

4. In *Grieb*, the issue was whether the indemnification clause of an insurance policy could create an implied duty to defend which was broader in scope than the duty to defend expressly defined in the policy.

5. *Wisconsin Transport Co. v. Great Lakes Casualty Co.*, 241 Wis. 523, 6 N.W.2d 708, 712 (1942), cited by Trane, is inapposite.

I conclude that where there is such a duty in the contract, an insurer may consider known or ascertainable facts outside the allegations only for the purpose of clarifying vague or ambiguous allegations. The insurer may not use outside facts to show that the allegations are false or groundless in order to avoid its duty to defend. Where a complaint clearly and specifically alleges damages of a type covered by the policy, the insurer who has agreed to defend suits with groundless or false allegations will necessarily be required to defend.

Therefore, the inquiry into Employers' duty to defend will proceed as follows: first, to ascertain what damages were alleged against the insured and, to the extent that these allegations are vague or ambiguous, whether the insurer knew or ascertained any additional facts which clarified the allegations; and second, to determine whether the damages, as alleged (and clarified), were within the coverage of the policy.

*B. Damages Claimed By Pritchard Against Trane*

*1. Nature of the allegations*

Pritchard alleged that its plants did not operate at their full capacity with the Trane heat exchangers. The damages alleged by Pritchard included money spent in attempted solutions to the shortfall problems, sums for which it may have become liable to utilities for the shortfall in production, sums it had to spend to rectify the failure of the heat exchangers to perform up to specifications, and damage to its business reputation.

Trane contends that the allegations demonstrate and constitute a "loss of use" of the Pritchard-designed plants. Trane also contends that the "essence" of these allegations is that damage was caused to the natural gas plants in the form of diminution of market value as a result of the Trane heat exchangers.

Employers argues that there is no allegation of loss of use or diminution of market value. Rather, it states that although a shortfall in production may cause loss of use, it does not follow that it *will* cause loss of use. In addition, it disputes any claim that finding the "essence" of Pritchard's claims in the allegations is either possible, permissible or necessary.

*2. Additional facts*

Employers has presented evidence to demonstrate that Pritchard's actual claims for damages involved only the cost of finding the cause of the shortfall, the cost of unsuccessful attempted solutions, the cost of the Kobe exchangers, and the installation of the Kobe exchangers. For the purpose only of determining Employers' duty to defend, I accept this evidence as a more specific showing of what was spent in attempted solutions to the shortfall problem and to actually rectify the failure of the heat exchangers.

Presumably, Employers intends that this factual information will relieve it of the duty to defend against Pritchard's other two damage claims—damage to business reputation and liability to utilities for the shortfall—which do not have a similar factual basis. However, since Employers was obligated to defend against false or groundless claims, it does not appear that this additional information alters Employers' duty. Therefore, even if Pritchard's claims for its potential liability to the utilities or its damaged reputation are groundless, there is still a duty to defend Trane against them.

*C. Potential Coverage Under The Substantive Provisions Of The Policy*

This case involves four different claims for damages arising out of the alleged damage to each of the four plants. Employers issued a new policy to Trane each year, and policies issued after June, 1973, contained several changes in wording. Consequently, before applying the provisions of the policies to the allegations concerning the four plants, I must determine which policy applies to each plant.

*1. Chattanooga plant*

The shortfall at the Chattanooga plant became evident shortly after the plant com-

menced operations in the fall of 1972 and continued until 1975 when the Trane heat exchangers were replaced by the Kobe heat exchangers. Employers contends that all of Pritchard's allegations claiming damage related to the Chattanooga plant should fall under the terms of one of the earlier, pre-1973 policies, specifically No. 0123–00–060762, since the shortfalls in production were first experienced in 1972. Trane appears not to disagree with this contention, although its position on this point is not altogether clear.

In order to decide which policy applies to the Chattanooga plant, it is necessary to determine whether, if the damage alleged by Pritchard constitutes an occurrence within the meaning of the policy language, it constitutes one occurrence or a number of occurrences and, if it constitutes one occurrence only, when that occurrence took place. Despite the apparent agreement of the parties on this particular aspect of the issue, the development of an appropriate standard for determining which policy applies is warranted because so many later findings are based on this initial determination.

The Employers policies are "occurrence" policies. Such a policy protects the policyholder from liability for any act done while the policy is in effect.[6] The first four Employers-Trane policies (June 1, 1969-June 1, 1973) define an "occurrence" as

an accident, including injurious exposure to conditions, which results, during the policy period, in ... property damage neither expected nor intended from the standpoint of the insured.

When used in these earlier policies, "property damage" means "injury to or destruction of tangible property."

Although the parties do not agree whether the malfunctioning of the Trane heat exchangers constitutes an occurrence within the policy, I shall assume for the purpose

only of this particular discussion that the heat exchanger problem is an occurrence, within the policy definition. In deciding which policy applies to the Chattanooga plant, the question is whether there was only one "occurrence," which occurred before June 1, 1973, such that any subsequent damage (after June 1, 1973) would still fall within the coverage of the 0123-policy, or whether the ongoing nature of the malfunctioning (until 1975) also brings the later policies into play.

In *Olsen v. Moore*, 56 Wis.2d 340, 202 N.W.2d 236 (1972), the Wisconsin Supreme Court defined an occurrence for insurance purposes by applying the cause theory. In that case, one negligent driver had struck two other vehicles almost simultaneously and the issue was the applicability of the "per occurrence" limit on liability stated in the policy. The court noted that under the cause theory, a single occurrence exists where there is

... but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage....

(Citations omitted.) *Id.* at 346, 202 N.W.2d 236. Thus, an occurrence included all damage flowing from a single proximate cause, and the injury to the two cars constituted only one occurrence.

The *Olsen* fact situation differs in many ways from that presented in the instant case. Nevertheless, the basic approach of *Olsen* is applicable to the Trane-Pritchard situation and represents Wisconsin law on this point. *Olsen* establishes in Wisconsin the proposition that a single occurrence includes all damages caused by a single proximate cause; stated another way, it holds that a single cause plus resulting damage defines a single occurrence. Further, it establishes that, although an action by the insured may cause on-going damage, an occurrence exists when the injured party is first damaged by the insured.

**6.** "Occurrence" policies are distinguished from "claims made" policies. The latter protects the holder only against claims made during the life of the policy. Thus, an insured company in business for one year would need only one

"occurrence" policy but several "claims made" policies to be adequately covered. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 535 n.3, 98 S.Ct. 2923, 2926, 57 L.Ed.2d 932 (1978).

Applying *Olsen*, I conclude that the Chattanooga damages constituted one occurrence stemming from a single injury: the operation of the defective Trane heat exchanger.[7]

■ Because I have determined that the allegations regarding the Chattanooga plant give rise to only one occurrence, the remaining question concerning the applicability of the various policies is that of determining when that occurrence began.[8] Employers argues that an occurrence begins when the complaining party is injured, not when the wrongful act is committed. I agree with this formulation; further, I conclude that the complaining party is "injured" when the damage actually appears to that party. *See, e.g., St. Paul Fire & Marine Insurance Co. v. Northern Grain Co.*, 365 F.2d 361 (8th Cir. 1966) ("occurrence" determined at point when crop damage resulting from sale of improper seed appeared); *Miller v. Lindgate Developers, Inc.*, 274 F.Supp. 980 (E.D.Mo.1967) ("occurrence" determined at point when damage to building from improper construction appeared). I conclude that this standard is what a reasonable person in the position of the insured would have believed to be the method of determining coverage.[9] *Ehlers v. Colonial Penn Insurance Co.*, 81 Wis.2d 64, 259 N.W.2d 718 (1977).

■ Accordingly, I find that the Chattanooga occurrence dates from the period directly following the 1972 start-up of the plant. It was during that period that Pritchard was allegedly first aware of being injured by the failure of its plant to produce at full capacity. Thus, I find that only Policy No. 0123–00–060762 governs the Chattanooga plant.

Under this pre-1973 policy, Employers agrees to defend any suit seeking damages which are covered by its policy. The policy covers those sums that the insured is liable to pay as damages because of property damage covered under the policy if the damage is caused by an occurrence. There appear to be four separate requirements which comprise this obligation under the policy:

(1) There must be property damage, defined as injury to tangible property.

(2) The damage must be caused by an occurrence of some sort.

---

**7.** The cause theory has been found to apply to a situation in which a component part causes on-going damage. *Bartholomew v. Ins. Co. of North America*, 502 F.Supp. 246, 251 (D.R.I. 1980) (citing *Olsen*, but applying Rhode Island law). In *Bartholomew*, owners of a car wash sought coverage under several policies as assignees of the manufacturers of a defectively designed and constructed car wash unit which had caused various items of damage. The court found that, although plaintiffs had suffered different types of damage as a result of the malfunctioning unit,

> the source of all their injury was a single event: the sale of a defectively designed and constructed car wash unit. According to the "cause theory," then, this unitary, uninterrupted cause produced but one occurrence for insurance purposes.

*Id.* at 252. *Accord Cargill, Inc. v. Liberty Mutual Insurance Co.*, 488 F.Supp. 49 (D.Minn. 1979), *aff'd* 621 F.2d 275 (8th Cir. 1980); *Champion International Corp. v. Continental Casualty Co.*, 546 F.2d 502, 506 n.3 (2d Cir. 1976).

**8.** This question takes on added importance in the discussion of the Skikda plant. *See* Part II, C, 2, *infra*.

**9.** The Wisconsin Supreme Court has not considered this precise issue. *Neumann v. Wis. Natural Gas Co.*, 27 Wis.2d 410, 134 N.W.2d 474 (1965), cited by Employers for the proposition that the party is injured when the damage occurs, concerned a sudden explosion and is distinguishable from cases such as this in which the damage manifests itself slowly over a period of time.

However, this "date of injury" standard is consistent with Wisconsin law concerning the accrual of a cause of action for limitations decisions, as expressed in *Tallmadge v. Skyline Construction, Inc.*, 86 Wis.2d 356, 359, 272 N.W.2d 404 (Ct.App.1978):

> We hold that a cause of action accrues and the statute of limitations (sec. 893.19(5), Stats.) begins to run when the evidence of injury to property, resulting from the negligent act upon which the action is based, is sufficiently significant to alert the injured party to the possibility of a defect. The injury need not, however, be of such magnitude as to identify the causal factor.

(3) The property damage caused by an occurrence must be of a type to which the particular policy applies, based on the specific type of coverage the insured has purchased.

(4) The property damage must have been translated into monetary damages which the insured is obligated to pay.

If there is to be coverage, all four factors must be present. Consequently, if Employers is to have a duty to defend, these four factors must have been alleged in the Pritchard complaint or have been ascertainable by Employers at the time Trane tendered the defense of the Pritchard case to Employers. For the reasons stated below, I find that the allegations of Pritchard's complaint and the facts readily accessible to Employers at the time of its refusal to defend do present a situation that is covered under Employers' policy.

*a.  The Pritchard allegations constitute property damage as defined in Employers policy*

Pritchard alleged that from the outset, the Chattanooga plant operated at 75% of capacity until the Trane exchangers were replaced by the Kobe exchangers. Pritchard also alleged that it suffered injury as a result of this 25% reduction and sought monetary damages from Trane. The parties have discussed exhaustively the meaning of these claims and allegations in terms of the property damage requirement. The threshold question, however, is simply whether a 25% reduction in the capacity of the plant constitutes an injury to tangible property.

Property damage is defined in the Employers policy as "injury to or destruction of tangible property." In its arguments to this court, Employers has relied heavily on *Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Co.*, 508 F.2d 417 (7th Cir. 1975), for the proposition that there is no property damage without physical injury to the property. In *Hamilton Die Cast*, the Court of Appeals for the Seventh Circuit

construed a definition of property damage similar to that in the Employers policy and concluded that the inclusion of a defective component part was insufficient to constitute property damage because no physical harm had resulted. However, *Hamilton Die Cast* was a diversity case in which the court of appeals applied Ohio law. Therefore, *Hamilton Die Cast* is not mandatory authority for this court's interpretation and application of Wisconsin law, especially because the Wisconsin Supreme Court, in *Sola Basic Industries, Inc. v. U. S. Fidelity & Guaranty Co.*, 90 Wis.2d 641, 280 N.W.2d 211 (1979), has addressed this same issue.

Moreover, in *Sola*, at 652–53, the Wisconsin Supreme Court held specifically that *Hamilton Die Cast* and *Dreis & Krump Mfg. Co. v. Phoenix Insurance Co.*, 548 F.2d 681 (7th Cir. 1977) (also relied on by Employers for the proposition that there must be physical damage to constitute property damage) were undermined by the reasoning in *Pittway Corp. v. American Motorists Ins. Co.*, 56 Ill.App.3d 338, 13 Ill.Dec. 244, 370 N.E.2d 1271 (1977), a subsequent case which "refused to accept the proposition that coverage for property damage under the policy was dependent on physical injury to property." The Wisconsin Supreme Court concluded that property damage to tangible property "does not necessarily require physical damage" and that "tangible property may be damaged in that it is diminished in value or made useless, irrespective of actual physical injury to the tangible property." 90 Wis.2d at 653–54, 280 N.W.2d 211. Consequently, it is clear that in Wisconsin the term "property damage" does not require physical damage to the property;[10] injury to tangible property may take the form of diminished value or loss of use. The question is whether the fact that the plant operated at only 75% of capacity had such a consequence; that is, whether the lowered operating capacity either diminished the plant's value or constituted loss of use of the plant.

---

**10.** The definitions of "property damage" in *Sola* and in Employers' pre-1973 policies are identical.

Employers argues that there was no loss of use because the gas liquefaction plants continued to be used for their intended purpose and that there was no proof that the plants were diminished in value. I do not agree. According to the Pritchard allegations, the failure of the Trane heat exchangers caused the Chattanooga plant to operate at only 75% of capacity. In effect, 25% of the plant was unused until the Trane heat exchangers were replaced with the Kobe exchangers. Although Pritchard had never actually had the use of this additional 25%, its allegations that the plant achieved the predicted capacity with the Kobe exchangers was sufficient to demonstrate a potentially valid claim sufficient to implicate Employers' duty to defend.

Similarly, a plant which experiences an ongoing 25% shortfall in production because of the failure of a component part is diminished in value. A plant that can produce 100,000 units of LNG in a given time period is more valuable to its owner or to a purchaser than a plant that produces only 75,000 units at the same cost. An allegation that a plant operates at only 75% of its predicted capacity is an allegation of diminished value and constitutes property damage. Whether this property damage results in a form of damages which is quantifiable and recognized by the courts as an appropriate remedy for the damage is a separate and distinct issue. At this point, it is enough to say that the failure of the heat exchangers caused Pritchard to suffer property damage to, and loss of use of, the Chattanooga plant, as those terms are defined by the Employers policy and in light of applicable Wisconsin law.

*b. The Pritchard allegations constitute an occurrence under the Employers policy*

The second factor necessary to impose a duty to defend under the Employers policy is an allegation sufficient to demonstrate that the event causing the damage was an "occurrence" as that term is defined by the

policy.[11] Under the pre-1973 Employers-Trane policies, an "occurrence" is "an accident, including injurious exposure to conditions, which results ... in ... property damage neither expected nor intended from the standpoint of the insured." Employers argues that the failure of the heat exchangers was not an occurrence because it did not cause property damage. Since I have already held that there was property damage, this argument has lost its force. There is no suggestion that the failure of the heat exchangers was either expected or intended by Trane. The only question remaining under the definition of occurrence is whether the property damage resulted from an "accident or injurious exposure to conditions." I find that the damage to the gas liquefaction plant was caused by an injurious exposure to the faulty heat exchanger.

In arguing against this finding, Employers seems to rely on the intuitive notion that an injurious exposure to conditions implies a physical injury which results from prolonged exposure to a harmful condition. Given the fact that Wisconsin recognizes types of property damage other than physical damage, however, the inquiry must be whether the non-physical damage was caused by an accident or accidental exposure to conditions and specifically, whether a malfunctioning heat exchanger is such a condition. When this provision is construed in favor of the insured, the malfunctioning heat exchanger can be considered a "condition" in this context. The "injurious exposure to conditions" requirement is a provision designed to insure a causal connection between some unintentional act of the insured giving rise to liability and the damage caused by the act. Here, Trane supplied Pritchard with a heat exchanger which did not function properly and which unexpectedly caused a reduction in the value of the Pritchard liquefaction plants. The damage to the Pritchard plants was

11. In Part II, C, 1, *supra*, I discussed whether the failure of the heat exchangers and resulting damage constituted one or more than one occurrence for the purpose of determining which policy applied. At that time, I assumed *ar-* *guendo* that the failure of the heat exchangers gave rise to an occurrence so that the duties to defend or indemnify or both may have been implicated. In this section, I abandon that assumption and pursue the inquiry directly.

caused by their exposure to the unintended malfunctioning of the Trane heat exchangers.

*c. Coverage under the policy was indicated by Pritchard's complaint*

Employers insured Trane under a comprehensive general liability policy. Schedule 1 of Policy No. 0123–00–060762 describes the hazards covered under the liability policy. The "products and completed operations" hazards coverage, included in Schedule 1, is the aspect of the policy relevant to this action.

"Products hazard" is defined as including:

property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the ... property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others.

"Completed operations hazard" includes:

property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto...

on the condition that the damage occur away from the insured's premises.

The property damage alleged by Pritchard is of a type covered by one or both of these categories of protection. Pritchard brought its suit against Trane on theories of misrepresentation, breach of warranty, and negligent design or manufacture. These legal theories indicate that the types of wrongdoing for which Trane could have been held liable were hazards covered by the policy. Pritchard's damage could be covered by the products hazard provision since the damage arose either out of the heat exchangers themselves or out of Pritchard's reliance on Trane's representations or warranty concerning the heat exchangers. Alternatively, the damage also may be considered to have arisen out of the faulty operation of the heat exchangers or from Pritchard's reliance on Trane's representations concerning their operation within the Pritchard plant such that completed operations hazard coverage would apply. In either case, the property damage alleged by Pritchard falls within the types of coverage Trane purchased from Employers under its comprehensive general liability policy. Since the alleged damage is covered by Trane's policy from Employers, the third factor necessary to give rise to Employers' duty to defend is present.

*d. Damages which Trane would have been obligated to pay were alleged by Pritchard*

Pritchard alleged damages resulting from the property damage caused by the failure of the heat exchangers as follows:

(1) money spent in attempted solutions of the shortfall problems before discovery that the heat exchangers were the problem;

(2) all sums for which it may have become liable under contracts with the utilities;

(3) all sums which it had to spend to rectify the failure of the heat exchangers to perform up to specifications; and

(4) damage to its own business reputation, including lost future profits, resulting from the exchanger problem.

Although there may have been some question at the time of Employers' refusal to defend whether all of these claims for damages were supported by the facts, there can have been no question that a sufficient amount of proper damages was alleged to constitute a valid cause of action. The Chattanooga plant was a specially designed and constructed facility, essentially without a market value. A measure of damages to property without a market value is the reasonable cost of repairs necessary to restore the property to its proper condition. *Wisconsin Telephone Co. v. Reynolds*, 2 Wis.2d 649, 87 N.W.2d 285 (1958). The damages alleged by Pritchard in items (1) and (3) represent the reasonable cost of repair of the plant. They are appropriate consequential damages, foreseeable, and caused by the alleged injury.

Consequently, the Pritchard complaint alleged property damage of a type covered by the Employers-Trane policy. It also contained sufficient allegations to demonstrate that the damage was caused by an occurrence and gave rise to a claim for monetary damages. Therefore, the Pritchard complaint alleged sufficient facts to impose upon Employers a duty to defend, provided that coverage was not precluded by some other policy provision.

*e. Exclusion (k) does not preclude coverage of the Pritchard allegations*

Employers argues that even though the claim for property damage may fall within the basic policy coverage, Exclusion (k) renders the policy inapplicable to the Trane-Pritchard situation. According to Exclusion (k), the policy does not apply to:

... property damage resulting from the failure of the named insured's product or work completed by ... the named insured to perform the function or serve the purpose intended by the named insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured, but this exclusion does not apply to ... property damage resulting from active malfunctioning of such products or work.

Under Employers' theory, Exclusion (k) applies to this case because

(1) the property damage resulted from the failure of the heat exchanger;

(2) the failure was due to a mistake in design; and

(3) the property damage did not result from active malfunctioning of the heat exchanger.

Employers concedes that the actual words of Pritchard's complaint allege that the failure was caused by negligent design or negligent construction and that damage due to negligent construction is not excluded. Nevertheless, Employers has submitted deposition testimony to demonstrate that Pritchard was not actually alleging or asserting facts to support a claim for negligent construction:

Q. Did anyone give you an opinion that the Trane Company had not used the right quality of materials, or used an improper method of manufacturing these heat exchangers?

A. I have no recollection or knowledge of anything like that....

(Deposition of Mr. William Friend, President of Pritchard, at 64.)

It is questionable whether this evidence is sufficient to prove that Pritchard was not alleging negligent construction. Even putting that issue aside, the deposition evidence does not demonstrate the applicability of Exclusion (k). deposition of Mr. Friend was taken on March 28, 1978, three and one-half years after the defense of the action was tendered to Employers. Any information gained from this deposition was not readily accessible to Employers at the time it decided to refuse to defend Trane. At that time, Employers based its refusal to defend on its opinion that the Pritchard pleadings did not allege property damage as defined in the Employers policy and on the ground that Exclusion (m) of the post-1973 policies released Employers from its duty to indemnify or defend Trane in the Pritchard action. Employers did not indicate that the reason for its refusal to defend was its belief that Pritchard had failed to allege negligent construction. Moreover, even if that had been Employers' position, it would have been erroneous; Pritchard's complaints repeatedly stress reliance on Trane's representations concerning the design *and* construction of the heat exchangers as the basis for its damage claims.

Employers' argument that Pritchard did not intend to prove a claim of negligent construction is essentially an argument that the negligent construction allegation was false or groundless. Yet, Employers had agreed to defend even false or groundless claims falling within the policy's coverage. It cannot excuse its refusal to defend by showing that an allegation is false or groundless. I find no support in the record for Employers' claim that Exclusion (k) ex-

cuses its refusal to defend Trane against Pritchard.[12]

Accordingly, I conclude that the allegations and facts readily apparent to Employers at the time Trane tendered to it the defense of the Pritchard action constituted a situation requiring coverage under Employers' policy. Moreover, I am persuaded that this interpretation comports with the reasonable expectations of the insured, keeping in mind that the insured is entitled to the benefit of the doubt on the duty to defend issue. *Ehlers v. Colonial Penn Insurance Co.*, 81 Wis.2d at 74–75, 259 N.W.2d 718; *Sola Basic Ind. v. U. S. Fidelity and Guaranty Co.*, 90 Wis.2d at 647, 280 N.W.2d 211. Therefore, I find that Employers had a duty to defend Trane against Pritchard's Chattanooga claim.

#### f. Conflict of interest

■ Employers also argues that it was relieved of its duty to defend because Trane and Employers had conflicting interests in the conduct and outcome of the Pritchard litigation. Employers has not set forth these conflicts in sufficient detail to warrant a finding concerning their effect on the insurer's ability to provide an adequate defense and I make no such finding.

■ However, whether or not such conflicts existed is immaterial to a finding that Employers breached its duty to defend. A conflict of interest between the insured and insurer does not relieve the insurer of its contractual duty to defend. Where there is a conflict, the insurer must either provide an independent attorney to represent the insured or pay the costs incurred by the insured in hiring counsel of the insured's own choice. *U. S. Fidelity and Guaranty Co. v. Louis A. Roser Co.*, 585 F.2d 932, 939 (8th Cir. 1978). Since Pritchard's Chattanooga claims gave rise to Employers' contractual duty to defend, Employers' failure to adopt either of these courses constituted a breach of its contractual obligation and makes it liable for appropriate damages. Consequently, I will grant Trane's motion for summary judgment on the issue of Employers' duty to defend Trane against Pritchard's Chattanooga claims.

### 2. Springfield, NIPSCO, Skikda plants

The parties agree that the three remaining plants, if covered, would fall within the ambit of the post-1973 policies. These policies contain the same description of coverage as the pre-1973 policies discussed above. Therefore, the four basic factors discussed previously must be present if there is to be coverage under the policies for the claims arising from these plants.

Under these policies, property damage means

(1) physical injury to or destruction of tangible property which occurs during the

---

**12.** Trane goes on to assert that even if I were to accept Employers' argument that Exclusion (k) was applicable, the savings clause of Exclusion (k) would prevent its use by Employers. The savings clause states that the exclusion does not apply to "property damage resulting from active malfunctioning" of the insured's product or work. Trane argues that the damage to the Pritchard plants resulted from "active malfunctioning" of the heat exchanger. I cannot agree.

The test to be applied concerning Exclusion (k) and its savings clause is whether the malfunctioning of the insured's product is simply a failure of that product to perform up to the expectations for it or whether the failure is some kind of extraordinary or aberrant departure from the purpose for which the product was designed. *American Employers' Insurance Co. v. Maryland Casualty Co.*, 509 F.2d 128, 130–31 (1st Cir. 1975). The essence of this distinction is that the insurer has not under-

taken to insure against the risk that the insured's product will not turn out to be as good as the insured intends it to be. Rather the insurer has merely agreed to pay damages when the insured's product departs from its intended purpose and causes injury to the person or property of another. *Cargill, Inc. v. Liberty Mutual Insurance Co.*, 488 F.Supp. 49, 52 n.4 (D.Minn.1979).

Here, the heat exchangers did not make a departure from their intended purpose, but merely failed to perform at the projected level. Such a failure cannot be considered "active malfunctioning" when viewed in light of case law and the common understanding regarding Exclusion (k). Consequently, I am not persuaded by Trane's argument on this point, even in light of the policies urging strict construction of exclusionary clauses against the insurer. *See American Employers Insurance v. Maryland Casualty Co.*, 509 F.2d at 132.

policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

Part (1) of this definition, read in conjunction with part (2), clearly rules out the type of non-physical property damage I found to be covered under the pre-1973 definition. Here the policy explicitly requires that the injury to tangible property be physical injury. In the face of such express language, *Sola Basic* and other cases construing different policy language can have no applicability.

However, part (2) of this definition defines property damage as loss of use of tangible property which has *not* been physically injured or destroyed. Thus, the initial inquiry regarding property damage under these post-1973 policies is whether there was a loss of use of the Pritchard plants.

The complaint alleges and the ascertainable facts demonstrate that the Springfield and NIPSCO plants operated at only 90 + % of capacity. They experienced this shortfall from the beginning of plant operation. Employers argues strenuously that the shortfall in production does not constitute loss of use and that even if it is a partial loss of use, partial loss of use does not satisfy the loss of use requirement of part (2). I find these arguments to be without merit. As I indicated in Part II, C, 1, b, *supra*, the shortfall in production does constitute loss of use under the pre-1973 policies. I conclude that it also constitutes loss of use under these post-1973 policies.

Concerning the contention that a partial loss of use does not satisfy the loss of use requirement in the policy, Employers cites no authority in its favor and its interpretation runs counter to the plain and logical meaning of the policy. There is nothing in the policy to indicate that a partial loss of use is not covered. The policy would apply where a portion of an enterprise is made unusable while other aspects carry on or where a total loss of use is experienced for

only a brief time. I see nothing in the policy which distinguishes those types of partial loss of use from that which exists here where a portion of the plant's capacity was unusable over a prolonged period of time. Accordingly, I find that Pritchard did allege sufficient loss of use in the Springfield and NIPSCO situations to constitute property damage.

The second factor which must be present is that the damage must be caused by an occurrence. An occurrence is defined in the post-1973 policies as

an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured.

Employers claims that the damage was not caused by an occurrence because the damage at the Springfield and NIPSCO plants was "expected" by Trane following the production shortfall at the Chattanooga plant. In support of this contention, Employers cites deposition testimony of Trane and Pritchard officials that following the shortfall at the Chattanooga plant, Trane and Pritchard combined to make alterations in the design of the heat exchangers to be installed at Springfield and NIPSCO (Deposition of Oliphant, at 124–126; Deposition of Kerckhove, at 77–79). In addition, Trane's executive vice-president stated in his deposition that it would not have been a "shock or surprise" had there been a shortfall at the Springfield plant. (Deposition of Kerckhove at 77.) Employers argues from this information that Trane expected the shortfall at Springfield and NIPSCO and that there can be no "occurrence" where the damage is expected.

Since the issue under consideration here is whether Employers had a duty to defend Trane, doubts about coverage must be resolved by the insurer in favor of coverage. Applying this standard to Employers' refusal to defend, I am unable to conclude that Trane "expected" the shortfall at Springfield and NIPSCO. The record demonstrates that the conditions at these plants were different from Chattanooga and that

changes had been made to the heat exchangers. Kerckhove testified that Trane was not sure what the output of the Springfield plant would be. (Deposition of Kerckhove at 77.) There is certainly the possibility, therefore, that the shortfall was not "expected" and that this possibility was sufficient to require a defense by the insurer. *See Koehring Company v. American Automobile Ins. Co.*, 353 F.2d 993, 996 (7th Cir. 1965) (applying Wisconsin law) (injury held to be "accidental" where not caused by voluntary, intentional, or foreseen infliction of damage); *C. Raymond Davis & Sons, Inc. v. Liberty Mutual Insurance Co.*, 467 F.Supp. 17 (E.D.Pa.1979) ("expected" defined as "considered more likely than not to occur"). Accordingly, I find that there was property damage caused by an occurrence.

The comprehensive liability coverage purchased by Trane after 1973 contained the same products and completed operations hazard provisions as the earlier policies. The conclusion in Part II, C, 1, c, *supra*, that the types of damage alleged by Pritchard are included within this coverage applies to these policies as well. Similarly, I conclude that Pritchard's allegations gave rise to claims for monetary damages as required by the policy. Consequently, all four factors warranting coverage under the Employers policy have been shown to be present.

However, I conclude that Employers did not have a duty to defend Trane with respect to the Springfield and NIPSCO plants because of the limitations imposed on coverage by Exclusion (m) of the post-1973 policies. According to Exclusion (m), the policy does *not* apply:

to loss of use of tangible property which has not been physically injured or destroyed *resulting from* 1) the delay or lack of performance by or on behalf of the named insured of any contract or agreement, or 2) *the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured* ; but this

exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury or the destruction of the named insured's product or work performed, by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured.

(Emphasis added.) The only type of property damage alleged by Pritchard which is arguably covered under the later policies is loss of use of tangible property not physically injured or destroyed. Under Exclusion (m), where loss of use results from the failure of the insured's products to meet the level of performance which the insured warranted or represented, there is no coverage for loss of use. This provision describes precisely what occurred in this case: the heat exchangers failed to perform at the level that Trane had promised.

The only exception to this exclusion occurs when the loss of use results from "sudden and accidental physical injury or the destruction of the named insured's product." There was no such sudden physical injury or destruction of the heat exchangers in this case. Therefore, the exception to the exclusion does not prevent its application to this case. Accordingly, Employers had no duty to defend Trane concerning the Springfield and NIPSCO plants because coverage was limited to loss of use by the definition of property damage and the specific type of loss of use alleged was excluded by Exclusion (m).

With respect to coverage for the Skikda plant, little need be said. The parties agree that, as late as 1978, the Skikda plant had not · begun operation. Consequently, at the time of filing the suits underlying this action, any production shortfall estimates were necessarily speculative. Whether this is deemed a lack of "property damage" or lack of "occurrence" is of little importance. The insurer has not agreed to reimburse the insured for all breach of contract damages. If the policy is to apply, there must be property damage caused by an occurrence. Where nothing more is al-

leged than the delivery of merchandise believed to be inadequate, this threshold has not been achieved. *Stone & Webster Engineering Corp. v. American Motorist Insurance Co.*, 458 F.Supp. 792 (E.D.Va.1978), *aff'd mem.*, 628 F.2d 1351 (4th Cir. 1980) (no property damage where defect was found and repaired before nuclear power plant began operations). Therefore, Employers had no duty to defend Trane with respect to the Skikda allegations. Accordingly, Trane's motion for partial summary judgment against Employers will be denied with respect to the Springfield, NIPSCO, and Skikda plants.

*D. Remedy for breach of duty to defend*

Having found that Employers breached its duty to defend Trane against the claims arising from the Chattanooga plant, I must consider the nature of the remedy for the breach and whether that remedy can be determined on this motion for summary judgment.

In Wisconsin, a liability insurer which declines to defend a suit against the insured does so at its peril. *Grieb v. Citizens Casualty Co. of New York*, 33 Wis.2d at 558, 148 N.W.2d 103. The insurer which wrongfully refuses to defend also loses the right to control the defense or the settlement of the action, and is liable for defense costs, including attorneys' fees. *Patrick v. Head of the Lakes Cooperative Electric Ass'n*, 98 Wis.2d at 72–73, 295 N.W.2d 205. Wisconsin courts have not considered this issue beyond these general points. However, the federal courts for this circuit and district have considered the full range of remedies for breach of the duty to defend in similar situations.

In *Solo Cup Co. v. Federal Insurance Co.*, 619 F.2d 1178 (7th Cir. 1980), the Court of Appeals for the Seventh Circuit considered this question under Illinois law. The court found that the insurer which wrongfully refuses to defend is estopped from denying coverage and is liable to the insured for (1) the costs of defending the suit, (2) the amount recovered from the insured, either by way of judgment or settlement, and (3)

any additional damages caused by the insurer's breach of contract. *Id.* at 1184. Similarly, this court has held that

> ordinarily an insurer's breach of its duty to defend subjects it to liability for the judgment against the insured up to the policy limits as well as the insured's litigation expenses...

*Capitol Indemnity Corp. v. St. Paul Fire & Marine Insurance Co.*, 357 F.Supp. 399, 414 (W.D.Wis.1972) (applying Minnesota law).

Where state law on a subject is silent, a federal court sitting in diversity can only use its best judgment to determine what the state supreme court would have held in the case. *Ness v. National Indemnity Co. of Nebraska*, 247 F.Supp. 944 (D.Alaska 1965). Since the measure of damages set out in *Solo Cup* and in *Capitol Indemnity* accords with the practice in the majority of other courts, 7C Appleman, *Insurance Law and Practice* § 4689 (1979), I find it applicable to the instant case.

Accordingly, I find that Employers is liable to Trane for the amount paid by Trane in settlement of the Chattanooga claim, provided that the amount does not exceed the limit of liability set by the policy. Although the policy limit of $50,000 per occurrence is easily ascertained from documentary evidence before the court, the amount paid by Trane in settlement of the Chattanooga claim is not readily apparent. The settlement Trane reached with Pritchard was a lump-sum amount disposing of claims regarding the four plants. The claim for which Employers has been deemed liable is only one of those four. Therefore, the question is whether Employers should be liable for the entire $50,000 or whether this amount should be prorated and reduced in some way.

In addressing this point, Trane relies primarily on *Space Conditioning, Inc. v. Insurance Co. of North America*, 294 F.Supp. 1290 (E.D.Mich.1968), *aff'd* 419 F.2d 836 (6th Cir. 1970), in which the defendant insurer admitted that it had breached its duty to defend, but contended that it should not be held liable for the entire judgment

against the insured because it was impossible to determine which part of the judgment related to the claims covered by the insurer. The trial court held against the insurer and required that it pay the entire judgment. In reaching this conclusion, however, the court relied heavily on *Comunale v. Traders and General Insurance Co.*, 50 Cal.2d 654, 328 P.2d 198, 68 A.L.R.2d 883 (1958), a case involving the denial of coverage—a more serious issue than the breach of duty to defend issue presented in *Space Conditioning* and in this case.

Employers relies on *Employers Mutual Liability Insurance Co. of Wisconsin v. Hendrix*, 199 F.2d 53 (4th Cir. 1952), which held that an insurer is not liable for all damages paid in compromise of a claim where some causes of action are beyond the scope of the policy. In *Hendrix*, the court further decided that where an insured settles a claim his insurer has refused to defend, the propriety and reasonableness of the settlement may be considered by the court. Other cases on this point, however, indicate that the issue presented in *Hendrix* has not been conclusively resolved by that case. Annot., 41 A.L.R.2d 434 (1955).

In addition to arguing that the reasonableness of the settlement be evaluated and the amount of the settlement be apportioned, Employers cites several cases for the proposition that the burden of apportioning falls on the insured. According to this argument, unless the insured specifies the portion of the settlement which relates to the cause of action covered by the policy, there may be no recovery whatsoever. However, the two Seventh Circuit cases cited by Employers, *Sager Glove Corp. v. Aetna Insurance Co.*, 317 F.2d 439 (7th Cir. 1963) and *Morris v. Western States Mutual Automobile Insurance Co.*, 268 F.2d 790 (7th Cir. 1959), are inapposite since neither concerns a situation in which the judgment or settlement had been reached after the insurer had refused to defend.

In the absence of any controlling authority, I decline to accept Employers' argument. I am not prepared to impose upon an insured which has conducted its own defense, negotiated its own settlement, litigated the insurer's duty to defend, and prevailed in that action, the additional burden of allocating the settlement before it can collect any damages for the insurer's breach. The insurer had the opportunity to participate in the settlement discussions. Its refusal to do so should not add to the insured's burden.

Moreover, I find that the arguments which would require a trial court to determine the reasonableness of the settlement are not applicable here. Even the opinion in *Hendrix*, relied upon by Employers, cautions:

We do not mean to hold that in every suit against an insurance company to collect an amount paid by the insured in compromise of a claim covered by the policy, it is the duty of the trial court to try the original action on its merits and make a determination of the amount of the damages suffered by the injured party.

199 F.2d at 59–60.

Employers has made no showing that Trane's settlement is not reasonable, and the conditions surrounding the settlement do not reveal any reason to question its propriety. The apportionment problem addressed by *Hendrix* and other cases is not present here. Those cases dealt with situations in which an insurer was potentially liable for the entire amount of the settlement. In this case, Employers' exposure is only $50,000, not the entire settlement. This amount, based on one of four claims, is presumably a relatively small proportion of the total settlement. In effect, it has been apportioned by the limits of the Employers policy.

There may be cases where a trial court must attempt to make a precise finding regarding the propriety of the portion of a settlement represented by the insurer's policy limits. For example, an insurer whose policy covers only one out of several claims could potentially be liable for an entire settlement amount. In this type of situation, a reasoned decision would have to be made based on cases and arguments similar to those presented by the parties in this

case. Here, however, imposing $50,000 liability on Employers for the Chattanooga cause of action is an equitable solution requiring no further inquiry. In order for the court to consider whether $50,000 is a disproportionately large amount of the total settlement, the issue would have to be raised explicitly by Employers.

Accordingly, I will enter judgment in favor of Trane in the amount of $50,000. In addition, I find that Employers is also liable to Trane for the costs, including reasonable attorneys' fees, of the Chattanooga defense and settlement. What this amount will be, however, must be determined at a trial.

### E. Employers' Liability for the Springfield, NIPSCO, and Skikda Claims

Employers has moved for summary judgment on the issue of its duty to indemnify Trane. With respect to the Springfield, NIPSCO, and Skikda plants, I conclude that Employers is entitled to judgment in its favor.[13]

■ I have already concluded that Employers had no duty to defend Trane against Pritchard's claims regarding the Springfield, NIPSCO, and Skikda plants because Pritchard's allegations did not describe claims within the coverage of the Employers policies. (See Part II, A, 2, supra.) As several courts have noted, the duty to defend an insured against an action is broader than the insurer's ultimate liability for the judgment. See, e.g., Lowenstein Dyes & Cosmetics v. Aetna Life and Casualty Company, 524 F.Supp. 574, 576 (E.D.N.Y. 1981); 7C Appleman, Insurance Law and Practice § 4684 (1979). The finding that Employers had no duty to defend necessarily includes a finding that, absent additional facts which would alter the scope of the

allegations, the insurer has no liability under the policies themselves.

The Seventh Circuit evaluated the interplay of the duty to defend and the obligation to indemnify in Solo Cup Co. v. Federal Insurance Co., 619 F.2d at 1184:

litigation over the independent duty to indemnify will result only: (1) when the insurer has already defended the action under a reservation of rights, the insured has been found liable, and the insurer thereafter contests the coverage of the policy; or (2) when the policy contains no defense clause. If the broader duty to defend has not been triggered, it is because the underlying action is not potentially within the coverage of the policy, and there could be, as a practical matter, no duty to indemnify in such a situation.

(Emphasis added.) This statement applies to the situation presented here. The insurer has not defended; the policy does have a defense clause. The broader duty to defend has not been triggered because there is no possibility of coverage under the policy. There are no additional facts in the record which would alter the allegations sufficiently to require coverage under the policy itself.

Accordingly, I conclude that Employers is not liable to indemnify Trane for damages alleged regarding the Springfield, NIPSCO, and Skikda plants and Employers' motion for summary judgment on this issue will be granted.

### III. AMERICAN MOTORISTS

### A. The Policy Definition Of The Duty To Defend

American Motorists insured Trane under one policy. According to the terms of this policy, American Motorists agreed

---

**13.** With respect to the Chattanooga plant, Employers' motion for summary judgment concerning its duty to indemnify Trane will be denied as moot. Employers has already been found liable to pay Trane $50,000 (plus other damages to be determined later) because of Employers' wrongful refusal to defend Trane with respect to the Chattanooga claims. This $50,000 represents Employers' liability for the amount paid by Trane in settlement of the Chattanooga claims and is the total amount of

Employers' exposure per occurrence of property damage according to Trane's policy. Even if Employers had a duty to indemnify Trane based on the actual coverage of its policy, Trane would not be entitled to any additional recovery because the amount that Employers will be required to pay as a result of its wrongful refusal to defend equals the maximum amount it could be required to pay under its duty to indemnify.

to indemnify the insured for all sums which the insured shall become obligated to pay as damages, direct or consequential and expenses, all as hereinafter defined as included within the term ultimate net loss by reason of liability

> (a) Imposed upon the insured by law . . .

because of personal injury, property damage or advertising liability caused by or arising out of an occurrence which takes place during the policy period anywhere in the world.

Although this description of coverage makes no mention of a duty to defend, that subject is covered in Endorsement # 167 which the parties agree is a part of the coverage purchased by Trane. Endorsement # 167 provides that

> [w]ith respect to any occurrence not covered by (1) the underlying policy(ies) listed in Declaration 7—Schedule of Underlying Insurance, or (2) any other underlying insurance available to the insured and provided such occurrence is covered by the terms and conditions of this policy, . . . the company shall:
>
> (a) defend any suit seeking damages because of personal injury, property damage, or advertising liability, even if the allegations of such suit are groundless, false, or fraudulent, provided (1) the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient . . .

Thus, American Motorists had a duty to defend Trane if the damage was not covered by an underlying policy and if there was coverage of the particular claim under its policy.

■ Whether the damage was covered by an underlying policy depends on the interplay of two factors: first, whether the monetary limits of the underlying policy are exceeded; and second, whether actual substantive coverage is denied by the underlying insurer. If the claim against the insured exceeds the monetary limits set by the underlying insurer, the excess insurer's duty to defend is usually activated, even if

the underlying insurer undertakes the defense as well. *See* Annot., Performance By One Insurer of its Duty to Defend as Excusing Failure of Other Insurers Equally Obligated to Defend, 90 A.L.R.3d 1199 (1979).

■ If the underlying insurer has refused to defend, asserting that there is no coverage under the substantive provisions of the underlying policy, the excess insurer will have a duty to defend, provided there is coverage under the excess policy and the claim falls within the policy limits of the excess insurer. In determining whether the proper conditions are present to invoke the excess insurer's duty, the standard is the same as that for a primary insurer: the excess insurer's duty is to be determined by the pleadings and readily ascertainable facts, with any doubt resolved in favor of the insured.

■ In this case, the amount of damage claimed was clearly in excess of the policy limits of the underlying insurer. Employers' coverage was limited to $50,000 per occurrence for property damage liability. The damages sought in the pleadings concerning the Chattanooga plant alone far exceeded $50,000. By itself this fact is sufficient to invoke American Motorists' duty to defend, if there is coverage under its policy. The fact that the underlying insurer refused to defend imposes an even clearer duty on American Motorists.

American Motorists suggests that it believed its policy to be sufficiently similar to Employers' so that it also would not be required to provide coverage. The relevant determination, however, is whether the alleged occurrences were potentially covered by the policy, giving rise to American Motorists' duty to defend. Accordingly, the question before the court is whether the pleadings and ascertainable facts indicated the presence of a situation covered by the American Motorists policy such that American Motorists had a duty to defend Trane against Pritchard.[14]

---

**14.** In Part II, B, *supra*, I discussed the claims against Trane's Employers policy made by

## B. Potential Coverage Under The Substantive Provisions Of The Policy

As with the Employers policy, coverage under the American Motorists policy requires four factors: there must be property damage, the property damage must be caused by an occurrence, the damage must result in damages which the insured will be obligated to pay, and the damage must be of a type covered by the policy.

### 1. The four basic factors warranting coverage were alleged by Pritchard

American Motorists' policy defines property damage as

physical injury to or destruction of tangible property . . . including the loss of use thereof.

This definition includes loss of use of tangible property within the concept of property damage. Although the Employers post-1973 policy contains a different definition,[15] it too includes loss of use of tangible property as a type of covered property damage. I have already found that the Pritchard complaints alleged a loss of use of tangible property under the Employers policy.[16] From the close similarity in the Employers and American Motorists policy provisions, I find and conclude that the "loss of use" terminology has the same meaning in both policies and that the loss of use experienced by Pritchard constitutes property damage under the American Motorists policy as it did under the Employers policy.

Moreover, since "occurrence" has virtually the same definition here as in the Employers policies,[17] I apply the same analysis of this issue that I used in determining the coverage of the Employers policy to the American Motorists policy.[18] I conclude that the property damage alleged by Pritchard was caused by an "occurrence" within the meaning of the terms of the American Motorists policy. I find, also, that under both the Employers and American Motorists policies, the damages alleged by Pritchard against Trane were sufficient to constitute a valid cause of action.[19]

Finally, I conclude that the damage alleged by Pritchard was a type of damage covered under the basic provisions of the Comprehensive Catastrophe Liability Insurance which Trane purchased from American Motorists. This type of insurance included coverage for "products-completed operations liability" which protects against liability arising out of the use of, or a warranty of, products manufactured or sold by the insured. Trane's liability arose from the use of its product by Pritchard and this liability falls within the basic coverage definition.

### 2. Exclusion (e)

The Pritchard allegations were sufficient for American Motorists to have concluded that Trane was potentially covered by the American Motorists policy and that American Motorists had a duty to defend Trane against Pritchard. However, American Motorists contends that even if there is coverage under the basic terms of the policy, coverage of the types of damage alleged by Pritchard is expressly excluded by Exclusion (e) of the policy. Exclusion (e) of the

---

Pritchard. The claims identified in that section are also the claims made by Trane against American Motorists on account of the Pritchard allegations.

**15.** Under the Employers post-1973 policy, property damage means "(1) physical injury to or destruction of tangible property . . . , or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."

**16.** *See* Part II, C, 2, *supra*.

**17.** Occurrence means "an accident, or a continuous or repeated exposure to conditions which results, during the policy period, in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured . . . ." under the American Motorist policy.

The Employers definition of occurrence is "an accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the insured."

**18.** *See* Part II, C, 1, b, *supra*.

**19.** *See* Part II, C, 1, d, *supra*.

American Motorists policy provides that the policy does not apply:

> to such part of any damages or expense which represents the cost of inspecting, repairing, replacing, removing, recovering, withdrawing from use or loss of use of, because of any known or suspected defect or deficiency therein, any
>
> (1) goods or products or any part thereof (including any container) manufactured, sold, handled or distributed by the named insured, or by others trading under his name, or
>
> (2) work completed by or for the named insured; or
>
> (3) other property of which such goods, products or work completed are a component part or ingredient.

American Motorists concludes that this exclusion justifies its refusal to defend against the Pritchard claims for damages arising from determining the source of the shortfall problems, replacing the Trane heat exchangers, and installing the Kobe exchangers. With respect to these specific claims for damages only, I agree that Exclusion (e) precludes American Motorists' liability.

Exclusion (e) is called the policy's "sistership exclusion," a description derived from the aircraft industry's practice of recalling planes for repairs when a "sistership"—a plane of the same model—has crashed because of a design defect. Trane argues that this exclusion denies coverage only for a manufacturer's own expenses in removing a line of products where one unit has been shown to be defective and that Pritchard's expenses should not be excluded. However, all of the cases cited by Trane in support of its argument are easily distinguishable from the American Motorists situation. For example, in *Thomas J. Lipton Inc. v. Liberty Mutual Ins. Co.*, 34 N.Y.2d 356, 314 N.E.2d 37 (1974) and *Arcos Corp. v. American Mutual Liability Insurance Co.*, 350 F.Supp. 380 (E.D.Pa.) *aff'd* 485 F.2d 678 (3d Cir. 1973), the exclusion clause was not identical to Exclusion (e) and was expressly limited by its terms to those situations where a product is completely withdrawn

from the market. Exclusion (e) does not contain such an express limitation; hence, its applicability is broader than the standard "sistership" exclusion. *St. Paul Fire & Marine Ins. Co. v. Northern Grain Co.*, 365 F.2d 361 (8th Cir. 1966), cited by Trane for the proposition that such an exclusion should apply only to the insured's damages, is inapposite because the exclusion there expressly applied only to injury to property of the insured. Again, Exclusion (e) is not similarly limited. Rather, I find that Exclusion (e) is unambiguous and applicable to those portions of Pritchard's claims that fall within its terms: the costs incurred in discovering and replacing the defective Trane exchangers and the damages representing loss of use caused by attempts to remedy the deficiency in the Trane product. Therefore, these claims for damages would not be covered by the American Motorists policy under which Trane was insured.

Less clear, however, is the effect of Exclusion (e) on Pritchard's second and fourth claims for damages—the sums for which Pritchard may have become liable under contracts with the various utilities and the amounts constituting damage to its own business reputation. Exclusion (e) does not preclude coverage of these claims for damages unless it is determined that the damages "represent" the cost of loss of use of the Trane heat exchangers because of the known or suspected defects. In deciding this issue in the context of determining whether American Motorists had a duty to defend Trane, any doubts must be resolved in favor of the insured. Under this standard, I conclude that Exclusion (e) does not apply to these two claims for damages.

As outlined above, the case law interpreting policy terms similar to Exclusion (e) is sufficiently distinguishable to make construction of this particular item a novel proposition. I believe it is clear, however, that the exclusion is designed to preclude coverage where the damages claimed are directly related to the presence of a known or suspected defect. The key to this analysis is the fact that this provision excludes only damages which "represent" the cost of

rectifying a defect. The use of the word "represent" limits the section's application; damages "resulting from" a defect, for example, would not be excluded.

Any sums for which Pritchard would have become liable under contracts with the various utilities would not *represent* a part of the cost of remedying a defect. These consequential damages would be caused by the defect and would result from the loss of use created by the presence of the defect, but they would not be so direct as to "represent" the cost of loss of use of the product.[20]

Similarly, injury sustained by Pritchard resulting from damage to its reputation is not a claim for damages which represents any part of the cost of remedying the defect. Rather, it is a form of consequential damages flowing from property damage covered by the policy. Consequently, Pritchard's allegations of damages based on sums which it may have been liable to pay the utilities and based on its damage to its business reputation do not constitute a type of damage which is excludable by any provision of the American Motorists policy under which Trane was insured.

Since these damages did not fall within any exclusion, I conclude that the Pritchard complaint alleged damages for which there was potential coverage under the American Motorists policy. In these circumstances, American Motorists had a duty to defend Trane, even though not all of the Pritchard allegations were within American Motorists' coverage. *Crawford v. Ranger Insurance Co.*, 653 F.2d 1248, 1253 (9th Cir. 1981); *Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 537 (8th Cir. 1970).

*C. Consequences Of American Motorists' Failure To Defend Trane*

In Part II, D, *supra*, I applied the rule that a wrongful refusal to defend subjects the insurer to liability to the insured for the costs of defending the suit, the amount recovered from the insured (up to the policy limits) and any additional damage caused by the insurer's breach of its contractual duty. Here, however, American Motorists did not simply refuse to defend, but instead brought this action seeking a declaration of its responsibility to the insured. It must be determined, therefore, whether an insurer which brings such an action instead of defending the insured has wrongfully refused to defend and thereby breached its contractual duty to the insured.

The state courts appear to be split on the question whether an insurer must defend under a reservation of rights while seeking a declaration of its duty to defend or whether the bringing of a declaratory judgment action is itself sufficient to fulfill the insurer's responsibility, at least temporarily. There is no Wisconsin law which directly controls the determination of this issue. In *Iowa National Mutual Insurance Co. v. Liberty Mutual Insurance Co.*, 43 Wis.2d 280, 168 N.W.2d 610 (1969), the Wisconsin Supreme Court did approve the use of the declaratory judgment procedure for determining an insurer's duty to defend. In that case, the insurer had also undertaken the defense of the insured while reserving its right to assert policy defenses and withdraw from the defense of the case. Although the court did not address directly the point at issue here, its language suggests that Wisconsin courts favor an approach in which an insurer defends under a reservation of rights while bringing an action for declaratory judgment:

> Iowa, by defending the [underlying] federal case under a nonwaiver of rights agreement and reservation of rights agreement, should not be foreclosed from bringing a suit for declaratory relief to determine its liability to defend under its policy. To do so would destroy the pur-

20. Damages "representing" the cost of loss of use could include money spent on alternatives or substitutes for the insured product while it was unusable. While it is true that another measure of the cost of loss of use could be lost revenues or lost profits during that period and that lost profits could be in the form of dam- ages paid to the utilities as a contract remedy, I am not prepared to rule that this formulation is sufficiently clear to cause a reasonable person in the place of the insured to believe that this claim for damages would be excluded by Exclusion (e).

pose and effectiveness of the nonwaiver agreement and the reservation of rights agreement. Such agreements are in the public interest and furnish temporary protection to the insured even though it may turn out he was not entitled to such protection. Without such an agreement, an insurer would be forced to deny liability in order to protect itself and its defenses.

43 Wis.2d at 286, 168 N.W.2d 610.

■ The parties have not cited, and I have not discovered, any additional Wisconsin cases on this issue.[21] In the absence of any more specific pronouncement by the Wisconsin Supreme Court than the inferences to be drawn from *Iowa National*, I am not prepared to rule that American Motorists breached its duty under the insurance contract by bringing an action for a declaratory judgment on the issue of its duty to defend without at the same time continuing to defend Trane against Pritchard.

I am influenced in this decision not only by the absence of Wisconsin authority on this point, but also by what appears to be the rule in the majority of states. In *Solo Cup Co. v. Federal Insurance Co.*, 619 F.2d

at 1184, n.3, for example, the Court of Appeals for the Seventh Circuit noted that under Illinois law an insurer which disputes coverage but has a contractual duty to defend "should either seek a declaration of its rights in an independent action, or should defend under a reservation of rights."[22] *See also* Note, Liability Insurance Policy Defenses and the Duty to Defend, 68 Harv. L.Rev. 1436, 1442 (1955).

Moreover, I believe that the standard expressed in *Solo Cup* is fair to both insured and insurer. If the insurer believes in good faith that there is no coverage under its policy, it does not seem either just or efficient to require it to defend despite its belief or, in the alternative, to risk liability for the entire judgment (the penalty for a wrongful refusal to defend). This "either-or" solution would tend to militate against a refusal to defend by the insurer, but could also prolong disputes between insureds and those claiming against them and leave the insurer without an effective remedy for the cost of a defense erroneously provided to an insured. At the same time, the insured is not hampered appreciably by this procedure if the underlying suit can be stayed pending the outcome of the declaratory judgment action.[23]

21. It is clear that the bringing of a declaratory judgment action is against public policy in Wisconsin where permitting such an action would result in separate trials between the same parties on issues arising out of the same cause of action. *Allstate Insurance Co. v. Charneski*, 286 F.2d 238, 240 (7th Cir. 1960) (applying Wisconsin law). Generally, this principle applies where the injured party has a statutory right to sue the insurer directly and the insurer's claim that the policy does not apply is a defense against the injured party's cause of action. In that situation, a declaration of the applicability of the policy to the type of claim alleged would not necessarily terminate the controversy between the injured party and the insurer. If the policy were declared to be applicable, the issue of the insured's negligence would still remain to be litigated. Since there is no such problem in this case, this aspect of Wisconsin public policy is not material to a decision on this issue.

22. Trane's argument that the insurer must secure a declaratory judgment of its rights and obligations while defending its insured is based on a 1968 Illinois case, *Country Mutual Insurance Co. v. Murray*, 97 Ill.App.2d 61, 239

N.E.2d 498 (1968). The standard set out by the Seventh Circuit in *Solo Cup*, however, is based on a later Illinois case, *Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 355 N.E.2d 24 (1976), a fact that significantly undercuts Trane's argument.

23. Since the duty to defend issue can usually be decided on the basis of the allegations and the terms of the policy, a judgment on this issue could be reached fairly quickly (the instant case to the contrary notwithstanding).

There is a strong argument that there is prejudice to an insured under this procedure since the insured must essentially defend itself against the injured party and against its insurer. In addition, it is argued that this double litigation is highly inefficient and that, as a result, the declaratory judgment action to determine a duty to defend is highly disfavored in some states. *See* Brown, *The Demise of the Declaratory Judgment Action as a Device for Testing the Insurer's Duty to Defend*, 23 Clev. St.L.Rev. 423 (1974). However, I see no basis for applying these arguments where they represent neither Wisconsin law nor the majority approach.

Consequently, I conclude that an insurer who brings a declaratory judgment action to determine its duty to defend without also defending the underlying action has not breached its contractual duty to defend under Wisconsin law. Ordinarily, this holding will obviate any discussion of damages for the refusal to defend because the insurer will decide whether or not to defend the underlying action based on the outcome of the declaratory judgment action. Here, however, there remains the question of the responsibility of the parties where the insured has an opportunity to settle the case and proceeds to do so while the declaratory judgment action is pending, the situation which occurred in the case at bar. No court has addressed this issue. I believe that in such a situation the outcome of the declaratory judgment action should have the following effect:

(1) where the insured negotiates a settlement and the insurer is found not to have had a duty to defend, then the insurer is not liable to the insured; but

(2) where the insured negotiates a settlement and the insurer is found to have had a duty to defend, then the insurer is liable to the insured for the legal costs involved in reaching the settlement.

In addition, in the situation described in sub. (2), above,

(1) where the insurer is found to have a duty to defend, but ultimately is adjudged not to have a duty to indemnify the insured (because the actual facts of the case demonstrate that the policy does not apply), then the insurer has no additional liability to the insured resulting from its refusal to defend, beyond payment of legal expenses involved in reaching the settlement; but

(2) where the insurer is found to have a duty to defend, and ultimately is adjudged also to have a duty to indemnify the insured (because the facts of the case demonstrate that the policy does apply), then the insurer is liable to the insured for the full settlement amount up to the policy limits and is precluded from contesting the reasonableness or allocation of the settlement.

I am aware that this formulation may alter the parties' rights and obligations in ways they may not have foreseen; however, in the absence of any reported cases which propose a resolution to the type of situation presented here, the court must delineate a method for settling the controversy. Furthermore, I believe this formulation to be consistent with the standards and procedures outlined in the cases already mentioned in this order dealing with issues which relate to, but do not resolve, those presented at this particular point.

Applying these rules to the situation presented here, I am able to conclude that since American Motorists was found to have had a duty to defend Trane, it is liable to Trane for some portion of the attorneys' fees and costs associated with negotiation of a settlement with Pritchard. (Employers will also be ordered to bear a portion of those legal expenses. *See* Part II, D, *supra*.) The precise amount of American Motorists' liability for these expenses will have to be determined at a trial.

However, from the rules outlined above, I am unable to conclude whether American Motorists has any additional liability to Trane. These rules state that an insurer which brings a declaratory judgment action instead of defending its insured is liable to the insured for the amount of the settlement only if it is determined that the insurer had a duty to indemnify the insured. As explained more fully in Part III, D, *infra*, I am unable to determine on the present record whether American Motorists had a duty to indemnify Trane. Until that determination is made at a trial, I cannot determine whether American Motorists has any liability to Trane for the amount of the settlement.

### D. American Motorists' Liability to Trane under its Duty to Indemnify

American Motorists has moved for summary judgment on the issue of its duty to indemnify Trane, asserting that the Pritchard allegations do not constitute the type of damage covered by the American Motorists policy. In Part III, B, 2, *supra*, I concluded

that Pritchard's claims were not excluded by any provision of the American Motorists policy to the extent that they gave rise to two particular types of damages: sums for which Pritchard may have become liable under contracts with the various utilities and the amounts constituting damage to Pritchard's own business reputation.

■ However, the record does not disclose whether Pritchard *actually* suffered any damage as alleged in those parts of its complaint found to be potentially within the coverage of the American Motorists policy. American Motorists has asserted that Pritchard did not suffer any such damages and I find that a genuine issue exists with respect to this material fact. Consequently, American Motorists' motion for summary judgment on the issue of its liability to Trane cannot be granted.

## IV. ST. PAUL

### A. Duty To Defend

St. Paul insured Trane under an Excess Third Party Liability Policy. There is a dispute between Trane and St. Paul concerning St. Paul's willingness to defend Trane. Trane has alleged that St. Paul refused to defend following its tender of the defense to the insurer. St. Paul has denied this allegation and contends that it was willing to defend Trane, but that its attempts to participate in the defense were rebuffed by Trane. Clearly, if St. Paul's willingness to defend Trane were dispositive of the duty to defend issue, there could be no partial summary judgment on this issue in the face of a factual dispute of such importance.

■ However, even if St. Paul had refused to defend Trane, Trane would not be entitled to summary judgment in its favor on this issue. Conditions Nos. 1 and 2 of the St. Paul policy excuse St. Paul from the strict duty-to-defend obligation found in the Employers and American Motorists policies.

Condition No. 1 reads as follows:

It is agreed that this Policy, except as herein stated, is subject to all conditions, agreements and limitations of and shall follow the Primary Insurance in all respects, including changes by endorsement and the Insured shall furnish the Company with copies of such changes. It is further agreed should any alteration be made in the premium for the policy/ies of the Primary Insurers during the period of this Policy, then the premium hereon other than the Minimum Premium shall be adjusted accordingly.

American Motorists was the primary insurer under the St. Paul policy. Trane argues that Condition No. 1, coupled with the duty to defend provisions of the American Motorists policy, imposes a duty to defend on St. Paul because Condition No. 1 requires St. Paul to follow the primary insurer in all respects. St. Paul points out that the extent to which its policy is governed by the conditions of the primary insurance is limited by the phrase "except as herein stated" and that Condition No. 2 expressly removes from St. Paul any duty to defend, by stating:

Notice of any accident, which appears likely to involve this Policy, shall be given to the Company, which *at its own option, may, but is not required to*, participate in the investigation, settlement or defense of any claim or suit.

(Emphasis added.) Trane suggests that if Condition No. 1 and Condition No. 2 are read together, Condition No. 2 can refer only to those situations where the defense of a claim has not been tendered to the excess insurer. Under this theory, where the defense is tendered to the insurer, Condition No. 1 would require the insurer to act according to the terms of the underlying policy.

I cannot agree. Condition No. 2 is unambiguous in its declaration that "the Company ... at its own option, may, but is not required to," defend any accident under the Policy. The phrase "but is not required to" emphasizes that this provision relates to situations where the insurer might be required to defend; that is, where the defense is tendered to the insurer. Moreover, the "except as herein stated" language of

Condition No. 1 reconciles the two provisions by permitting exceptions, such as Condition No. 2, to the language of Condition No. 1.

Trane makes the additional argument that the Insuring Agreement itself locks St. Paul into the duty to defend provision of the American Motorists policy. The Agreement provides:

> In consideration of the payment of premium stated in the Declaration, the ST. PAUL FIRE AND MARINE INSURANCE COMPANY . . . agrees to indemnify the Insured, in accordance with the applicable insuring agreements of the Primary Insurance . . . as fully and to all intents and purposes as though the Primary Insurance had been issued for the limits set forth in Item 5.

Trane contends that the duty to indemnify includes the duty to defend. St. Paul reads this provision as requiring only compensation for losses covered by the policy; moreover, it notes that the Agreement is limited by the conditions which follow it.

Even though the insured is entitled to have doubts resolved in its favor in considering the duty to defend, I am persuaded that the Agreement did not create a contractual duty under which St. Paul was obligated to defend Trane. Trane makes several arguments that this result is damaging to Trane and could not have been intended. Although this policy language does appear to favor the insurer, the existence of such bias does not warrant an interpretation beyond the clear and unambiguous language of the policy. *Limpert v. Smith*, 56 Wis.2d 632, 203 N.W.2d 29 (1973). There is nothing about this interpretation of the agreement to suggest that the parties' intentions are not being enforced. In fact, it seems quite clear that the situation present here, where the insurer may have had a duty to defend although there probably was not coverage, is precisely the type of risk this provision was intended to avoid.[24] The cases cited by Trane in support of its argument, such as *Meiser v.*

*Aetna Casualty & Surety Co.*, 8 Wis.2d 233, 98 N.W.2d 909 (1959), merely support the proposition that exclusion clauses in liability policies are construed against the insurer where the terms are ambiguous. Where, as here, the policy terms are unambiguous, I find these cases inapposite.

I find and conclude that St. Paul had no duty to defend Trane because the express language of Condition No. 2 denies the existence of any such duty.

**B. Duty To Indemnify.**

St. Paul has moved for summary judgment on the issue of its liability to Trane under the terms of its policy. The policy requires St. Paul

> to indemnify the Insured, in accordance with the applicable insuring agreements of the Primary Insurance, against loss subject to the limits stated in Item 5, Section I ($5 million) of the Declarations and as fully and to all intents and purposes as though the Primary Insurance had been issued for the limits set forth in Item 5, Section III ($10 million) of the Declarations. This Policy shall apply only to coverages for which an amount is indicated in Item 5, Section I ($5 million), and then only in excess of the corresponding amount as indicated in Item 5, Section II of the Declarations ($5 million).

(Figures supplied.) By virtue of this provision, St. Paul is liable only for amounts for which Trane becomes liable, over $5 million and under $10 million.

Trane's settlement with Pritchard is not a public record. Trane apparently concedes that St. Paul will not be liable for any contribution if the settlement amount is less than the policy limits of Employers and American Motorists. (Reply Brief in Answer to Supplementary Brief of St. Paul at 30.) *Accord Valentine v. Aetna Insurance Co.*, 564 F.2d 292 (9th Cir. 1977); *Molina v. U. S. Fire Insurance Co.*, 574 F.2d 1176 (4th Cir. 1978). Nevertheless, Trane argues that "until the liabilities of Employers and Motorists are finally determined, the exact

---

24. Under the provisions of Condition No. 2, where the insurer believes its policy will provide coverage and it is in the insurer's interest to join the defense, it may do so.

amount below or above Motorists' limits cannot be ascertained" and that St. Paul's motion for summary judgment is premature.

I do not agree. There is no suggestion in the record that the amount for which Trane has become liable approaches $5 million. In the absence of any such showing, I believe St. Paul has carried its burden of demonstrating that it has no obligation to indemnify Trane because Trane's damages do not exceed $5 million. I will grant St. Paul's motion for summary judgment in its favor on this issue.

## V. AMERICAN HOME

### A. Duty To Defend

American Home insured Trane under a following form Excess Umbrella Liability Policy # CE 2714 94 52, covering the period from July 1, 1972 to June 1, 1975. This policy provided indemnification to Trane for amounts for which Trane was legally obligated in excess of $10 million up to and including $20 million. By its terms, the American Home policy followed all terms and conditions of its underlying primary carrier. The underlying primary carrier for this policy was St. Paul Fire and Marine. The parties agree that a decision concerning St. Paul's duty will also govern the operation of the American Home policy.

Since I have determined that St. Paul Fire and Marine had no duty to defend Trane against the Pritchard claims, it follows that American Home had no such duty. Trane's motion for partial summary judgment against American Home will be denied.

### B. Duty To Indemnify

American Home's obligation to indemnify Trane begins when the sum for which Trane becomes liable exceeds $10 million. There is no indication in the record that Trane's loss will approach $10 million. Therefore, American Home has no obligation to indemnify Trane and its motion for summary judgment on this issue will be granted.

## ORDER

IT IS ORDERED that

(a) Trane's motion for partial summary judgment on the issue of Employers' duty to defend is GRANTED with respect to the claims arising from the Chattanooga plant and is DENIED in all other respects;

(b) Trane's motion for partial summary judgment on the issue of American Motorists' duty to defend is GRANTED; and

(c) Trane's motion for partial summary judgment on the issue of St. Paul's and American Home's duty to defend is DENIED.

IT IS FURTHER ORDERED that

(a) Employers' motion for summary judgment on the issue of its duty to indemnify Trane is DISMISSED as moot with respect to the Chattanooga plant and is GRANTED in all other respects.

(b) American Motorists' motion for summary judgment on the issue of its duty to indemnify Trane is DENIED;

(c) St. Paul's motion for summary judgment on the issue of its duty to indemnify Trane is GRANTED; and

(d) American Home's motion for summary judgment on the issue of its duty to indemnify Trane is GRANTED.

IT IS FURTHER ORDERED that judgment be entered against Employers in favor of Trane in the amount of $50,000.

The Clerk of Court is directed to schedule this matter for trial. The trial will be confined to the following issues: American Motorists' liability, if any, to Trane based on its duty to indemnify; American Motorists' and Employers' respective liability to Trane for attorneys' fees and costs relating to the negotiation of the settlement with Pritchard; and the four insurers' liability, if any, to Trane because of any intentional interference with Trane's defense or because of any conspiracy to refuse to defend Trane and interfere with Trane's defense, which are issues raised by Trane in its counterclaim and cross-claims against the insurers that have not been disposed of by this order.